Tracy Tribbett
PACIFIC JUSTICE INSTITUTE
6404 Three River Drive
Pasco, WA 99301
Email: ttribbett@pji.org

Alan J. Reinach, Esq., pro hac vice
Jonathon Cherne, Esq., pro hac vice
CHURCH STATE COUNCIL
2686 Townsgate Rd
Westlake Village, CA 91361
Telephone: (805) 413-7396
Facsimile: (805) 778-8843
ajreinach@churchstate.org
jcherne@churchstate.org

HONORABLE JAMAL N. WHITEHEAD

## UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| SCOTT CARLSON, TYLER PARNELL, BRIAN ROBILLARD ALISON HALLIFAX, SHARON L. DAVIS. MATTHEW PETERSON, ARTEM TETERIN, and JOSH FREI<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF REDMOND<br><br>Defendant | Case No.: 2:22-cv-01739-JNW<br><br><br>PLAINTIFF'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br>ORAL ARGUMENT REQUESTED<br><br>**Note on motion calendar: May 26, 2025** |

1

**<u>TABLE OF CONTENTS</u>**

2

**I. INTRODUCTION**......................................................................................1

3

**II. MATERIAL FACTS (UNDISPUTED, DISPUTED, AND QUALIFIED)**.........1

4

5
    **A. Plaintiffs Worked Successfully Throughout The Pandemic**    1

6
    **B. The Governor's Vaccine Mandate Allowed For Religious Accommodations.**    2

7
    **C. Plaintiffs Had Sincerely Held Religious Beliefs Against Receiving the Covid-19 Vaccine**    4

8

9
    **D. The City Initially Allowed Plaintiffs An Accommodation To Continue Providing Direct Patient Care Against Chief Sheppard's Wishes**    6

10

11
    **E. Defendant Never Offered Plaintiffs Any Jobs As An Accommodation.**    8

12
    **F. Defendant Could Have Accommodated Plaintiffs In Other Fire Department Positions.**    15

13
    **G. Defendant Could Have Accommodated Plaintiffs In Their Current Fire Department Positions.**    17

14
    **III. STATEMENT OF THE ISSUES**    30

15

16
    **IV. ARGUMENT**    30

17
    **V. CONCLUSION**    46

18

19

20

21

22

23

24

25

26

27

28

## I.   INTRODUCTION

When Plaintiffs submitted their religious accommodation requests not to get the Covid-19 vaccine, Defendant determined the requests were based on sincere religious objections, and exempted them from its vaccine mandate. Defendant also determined that an appropriate accommodation could be provided to them in their present positions, by adding daily testing before every shift, and other measures to an already highly effective and safe set of Covid-19 protocols.

What went wrong was Chief Sheppard's determination, supported by Mayor Birney, to obtain full compliance with the City's vaccine mandate or else. The City revoked the already approved accommodation agreements it had executed with the Plaintiffs, and pressured them to get vaccinated or be fired. The EEOC characterizes such efforts to compel employees to violate their religious beliefs as a condition of keeping their jobs as "religious coercion," a form of harassment. Chief Sheppard achieved his goal.

Plaintiffs contend they are entitled to partial summary judgment on their failure to accommodate claims, and claims of retaliation. There is direct evidence of retaliation. Plaintiffs also contend both that Defendant has failed to introduce sufficient evidence of undue hardship such that it should be denied summary judgment, but also, that the very accommodations Defendant approved and then revoked would not have caused an undue hardship, and therefore, Plaintiffs are entitled to dismissal of this affirmative defense – a defense Defendant never actually plead.

## II.       STATEMENT OF MATERIAL FACTS

### A.  Plaintiffs Worked Successfully Throughout The Pandemic

At 11:30 a.m. on February 28, 2020, the Redmond Fire Department responded to the first known infections of Covid-19 in the United States of America. [Whitney 30(b)(6) Depo., 93:4-11.] The Redmond Fire department required firefighters to utilize full PPE (personal

protective equipment) the following day: including gowns, gloves, masks, goggles, and booties. [*Id.* at 92:19-93:3.] Jim Whitney, the City of Redmond's (hereinafter "COR") 30b6 witness as to the policies and procedures the fire department was required to follow to mitigate the spread of Covid-19, testified that firefighters were "overly protected." [*Id.* at 93:3; 15:23-16:19.] Redmond firefighters are trained to deal with contagious diseases every year. [*Id.* at 94:4-16.] Firefighters encounter all sorts of contagious diseases in providing emergency medical response, such as flu, HIV, Hepatitis, Tuberolosis, respiratory illnesses, and GI illnesses. [*Id.* at 95:3-12.] Dealing with infectious diseases wasn't anything new when COVID arrived. [*Id.* at 95:24-96:4.]

Redmond Fire's crews "have done an exceptional job of executing established best practices to support their safety and taking all precautions to mitigate the spread of COVID-19 within the work force." [*Id.*, 63:17-64:1, Exhibit 149, p. 14.] Using the PPE and routine communication of the risks is how the RFD did an exceptional job of mitigating the spread of Covid-19. [*Id.*, 65:21-66:24.] Plaintiffs "had exceptional compliance with the COVID exposure controls." [Sheppard, Day 1, Depo, 79:15-80:4.] The COR is not aware of any transmissions of COVID-19 from a firefighter to a patient or a patient to a firefighter at anytime throughout the pandemic. [Whitney 30(b)(6) Depo., 64:3-9.] COR's is "not aware of any impacts" that the unvaccinated firefighters had on the City of Redmond prior to the vaccine mandate [Laird 30(b)(6) Depo., 162:18-21], despite them working as emergency responders until the vaccine mandate. [Carlson Dec. ¶¶ 2-13, 20; Hallifax Dec ¶¶1, 6, 10; Robillard Dec. ¶¶8-10; Parnell Dec. ¶5; Frei Dec. ¶11-18; Peterson Dec. ¶¶1-2, 14; Teterin Dec. ¶6-8, 23; Davis, Dec. ¶21, 25.] The City's own 30(b)(6) witness testified that the Plaintiffs could have continued to provide direct patient care with a religious accommodation. [Whitney, 30(b)(6), Dep. 119:15-120:12.]

**B.  The Governor's Vaccine Mandate Allowed For Religious Accommodations.**

On August 9, 2021, the Governor issued Proclamation 21-14 which required all health care providers and any individual that works in a health care setting to be vaccinated for Covid-19. [Sheppard, Day 1, Dep. 178:1-7, Exh. 106, p. 4.] The proclamation stated that health care workers "are not required to get vaccinated for COVID-19 if they are entitled" to a sincerely held religious belief accommodation under Title VII or WLAD. *Id.* It further states that "Nothing herein precludes entities from providing religious accommodations to the requirements of this order…." *Id.*

**i.  Defendant Selectively Complied with the Governor's Proclamation**

The Governor's Proclamation required police officers who ride in aid cars (ambulances) to be vaccinated. [Sheppard Dep., Day 1, 51:20-52:3.] But COR permitted police officers to ride in aid cars unvaccinated. [Lowe, 30(b)(6) Dep., 64:12-22, 65:2-11; Lincoln Dep., 14:7-10, 66:7-19.]  The Governor's Proclamation also required mechanics who work on ambulances to be vaccinated for Covid-19. [Laird, 30(b)(6), 44:23-45:18, Exh. 66, p. 8; Exh. 66, p. 8. Despite the proclamation's clear requirement, the City never mandated its ambulance mechanics to be vaccinated:

```
11· · · ·Q.· And the mechanics who
12· work on the fire rigs, they were not required to be
13· vaccinated; is that correct?
14· · · ·A.· ·That is correct.
15· · · ·Q.· ·When you say fire rigs, is that referring to,
16· like, the trucks, the ambulances, and the aid cars?
17· · · ·A.· ·Correct.· All of the vehicles.· Yes.
[Laird, 30(b)(6), Dep. 71:11-17.]
```

Despite flouting the proclamation in the above instances, Defendant took a hard line with the unvaccinated firefighters. [*Id.*, 101:19-24, Laird Exh 5.] Yet, the Governor's Proclamation allowed unvaccinated firefighters with religious accommodations to continue

providing patient care, and the City understood this. [*Id.* 90:20-23, Exh. 66, p.11.] On September 13, 2021, the Washington State Department of Health issued guidance regarding the proclamation, which the City read at the time. [*Id.*, 44:23-45:18, Exh. 66.] The guidance stated that individuals who are entitled to sincerely held religious belief accommodations are exempt from the proclamation. [*Id.* Exh. 66, p. 5.] Defendant understood that its unvaccinated firefighters with religious accommodations were exempt from the proclamation. [*Id.*, 90:9-19.] Defendant also understood that the proclamation allowed for testing as an accommodation for unvaccinated firefighters in order to allow them to continue working in a healthcare setting. [*Id.*, 90:24-91:11.] Laird never discussed this exemption with anyone in relation to the Plaintiffs' request for religious accommodation. [*Id.*, 93:25-94:9.]

Despite reading the guidance that allowed unvaccinated firefighters to provide direct patient care, Chief Sheppard took a contrary position, insisting that the Governor's order did not permit firefighters to work in direct patient care. [Sheppard, Day 1, Dep. 132:2-8; 179:11-180:3; 185:5-9; 187:9-188:16] When questioned at his deposition, Sheppard could not find any document or support for his position. [*Id.*, 190:20-24, 192:18-24.] There is none.

### C. Plaintiffs Had Sincerely Held Religious Beliefs Against Receiving the Covid-19 Vaccine

Each Plaintiff has sincerely held religious beliefs preventing them from receiving the Covid vaccine. [Carlson Dec. ¶¶ 15-16; Hallifax Dec ¶¶8-9; Robillard Dec. ¶¶16, 50-51; Parnell Dec. ¶8-9, Exhs 2-3; Frei Dec. ¶22-23, Exh 5; Peterson Dec. ¶20, Exh. 4; Teterin Dec. ¶¶1, 16; Davis, Dec. ¶1-5, 26, Exh. 2.]. Each Plaintiff submitted a request for religious accommodation to the Covid-19 vaccine mandate. [*Id.*] Cathryn Laird, the Director of HR was responsible for handling the Plaintiffs' request for religious accommodation, but she was never trained and had no prior experience. [Laird 30(b)(6) Dep. 35:10-36:7; 41:23-25.] In handling their requests for

accommodation, the City did not give Plaintiffs favored treatment, in violation of *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (U.S., 2015). [Laird 30(b)(6) Dep. 41:2-17.] The City designated her to speak on its behalf regarding the Plaintiffs' request for religious accommodation. [*Id*. 14:11-15, 17:23.] When asked if the COR understood that each of the Plaintiffs had a sincerely held religious belief, Laird stated: "Yes. Absolutely. That was made Clear." [*Id* Dep. 43:5-6.] Laird also testified:

> **11  Q. Did the City, at any time,**
> **12 ever question whether any of the plaintiffs' beliefs were**
> **13 religious?**
> **14 A. No.**
> **20 THE DEPONENT: We believe that -- that their -- it**
> **21 was sincere. That it was sincerely held that they didn't**
> **22 want to be vaccinated.**
> **24 Q. And the City has that same belief as of today; is**
> **25 that correct?**
> **1  A. Yes.**
> [Laird 30(b)(6) Dep. 43:11-44:1.]

At the time the COR granted the Plaintiffs request for religious accommodation, the COR understood the Governor's Proclamation prohibited the COR "from granting accommodations that were based on false, misleading, or dishonest grounds, or personal preference." [*Id*. 46:10-15.] COR understood it was required to conduct an individualized assessment to determine if each Plaintiff's request justified an accommodation. [*Id*. 46:22-47:2.] The City did such an individualized assessment of each Plaintiff and found each Plaintiff qualified for a religious exemption. [*Id*. 47:3-10.] To this day, the City does not question that Plaintiffs beliefs were religious and sincerely held. [*Id*. 43:5-44:1.]

//

//

//

### D. The City Initially Allowed Plaintiffs An Accommodation To Continue Providing Direct Patient Care Against Chief Sheppard's Wishes

On September 7, 2021, Laird sent an email "passing on the good news that the Mayor and Malisa [COO] agreed" to allow unvaccinated firefighters to continue working in the healthcare setting with a religious accommodation pursuant to the Governor's Proclamation. [*Id.* 107:2-20, 113:19-23, Exh. 122.] However, Chief Sheppard testified he was not in agreement and that he shared that with the City. [Sheppard, Day 1, Depo, 164:13-23.] Sheppard believed the firefighters were prohibited by the proclamation from working directly with patients, and he did not agree with the proposal to allow them to work with patients unvaccinated. [*Id.,* 179:23-180:14.] Sheppard never sought any advice from the State as to whether his understanding was correct, despite the proclamation guidance stating if you have questions you can contact us at Covid.Vaccine@doh.wa.gov. [*Id.*185:11-20, 198:9-14, Exh. 66, p. 15.] Chief Sheppard had also agreed with the fire chiefs from Bellevue and Kirkland that they would not give accommodations allowing direct patient care, in order to have a uniform front. [*Id.* 172:1-18.]

However, given the Mayor and COO's approval, Cathryn Laird started processing the firefighters request for religious accommodation and the COO approved them. Laird approved requests of Plaintiffs Carlson, Frei and Teterin on September 10, 2021, Davis on September 13th, Hallifax and Parnell on September 14, and Robillard and Peterson on September 20th. [Dkt 71-1, Sheppard Decl. Exhs. 8 (a)-(h)].

But the City promptly reversed course. [Sheppard, Day 1, Dep. 161:4-16.] A notice was issued on September 20, 2021. [Laird, 30(b)(6), Dep. 121:16-122:13.] Laird was also told she was no longer allowed to give accommodations to unvaccinated firefighters allowing them to work directly with patients. [*Id.* 126:19-127:7.] Plaintiff Josh Frei and firefighter Davin Alsin

requested a meeting with the Mayor that same day. [Frei Declaration, ¶ 29.] The following morning, the union president emailed Chief Sheppard and Cathryn Laird, asking why the city reversed its "original stance on masking and pre-shift testing as acceptable accommodations for unvaccinated EMTs to continue in their present roles." [Sheppard, Day 1, Dep, 158;3-23, Exh. 110.]

On September 22, 2021, Chief Sheppard met with Dr. Thomas Rea, the medical program director for King County and asked for a letter supporting his position that unvaccinated firefighters should not provide direct patient care. [Dkt 71-1, Sheppard Decl. par. 9; Sheppard Depo, Day 2, 36:19-37:23.] Rea's letter was not the basis for Sheppard's effort to deny Plaintiffs the already agreed upon accommodations: Sheppard testified the only reason he mandated the vaccine was because of the Governor's proclamation and the Mayor's subsequent executive order. [Sheppard, Day 1, 140:24-141:6.]

On September 27, 2021, the Mayor and Chief Sheppard met with Davin Alsin and Josh Frei. [Birney Dep, 63:17-21; Frei Dec. ¶ 30.] Frei and Alsin presented a study by Dr. Rea and UW Medicine, showing 'extremely low risk of transmission' of Covid between EMTs and patients. [Birney Dep, 63:22-64:23; Frei Dec. ¶¶ 30-31.] Mayor Birney responded that "extremely low risk of transmission" is not enough, "only zero risk of transmission is acceptable." [Frei Dec. ¶ 31.] The Mayor also stated that "because of public perception I need to show that I am making the unvaccinated uncomfortable" and "I want to show that we are treating the unvaccinated differently." [Frei Dec. ¶ 31]

On September 30, 2021, the Mayor issued an executive order requiring all firefighters to be fully vaccinated by October 18, 2021, and prohibiting unvaccinated firefighters from "engaging in work in a Health Care Setting, as defined by the Proclamations" after that date.

[Birney dep. 75:23-76:4, Birney Exh. 4.] The Mayor signed a Letter of Understanding ("LOU") with the union that same day giving unvaccinated firefighters only two options: get vaccinated or choose voluntary separation, otherwise they would be terminated. [Laird 30(b)(6), 101:19-24, Laird Exh 5.] Defendant did not approve any religious accommodations as of that date. [*Id.* 101:25-102:2.] Due to the severe emotional distress and roller coaster Defendant subjected them to, Plaintiffs took FMLA leave, except Teterin. [*Id.* 138:23-139:3; Carlson Dec. ¶ 20; Hallifax Dec ¶¶10-11; Robillard Dec. ¶24; Parnell Dec. ¶14, 17; Frei Dec. ¶34-35; Peterson Dec. ¶¶14-16; Davis, Dec. ¶32.]

**E.  Defendant Never Offered Plaintiffs Any Jobs As An Accommodation.**

After Plaintiffs accommodations were revoked, Defendant never offered any further accommodation to any Plaintiff. [Carlson Dec. ¶¶ 46-48; Hallifax Dec ¶¶12-13; Robillard Dec. ¶¶42-44; Parnell Dec. ¶¶18, 27, 37, 54; Frei Dec. ¶35, 55; Peterson Dec. ¶¶22, 30; Teterin Dec. ¶¶22, 27-28; Davis, Dec. ¶¶35-36; Laird 30(b)(6), 145:23-25]

Two days after the deadline to be vaccinated or separated, on October 20, 2021, Defendant identified positions where unvaccinated firefighters could work. [Laird, 30(b)(6), 163:23-164:5; Whitney Dep. 178:13-20, Exh. 144.] Defendant only identified five (5) positions, and one of the positions expired in three months. [*Id.* Exh. 144.] There were eleven (11) firefighters needeing an accommodation. [Sheppard, Day 2, 11:1-11, Exh. 98.] The Fire Department did not identify enough positions to accommodate all the unvaccinated firefighters. [*Id.*, 10:17-20.] The union had suggested positions to accommodate all the firefighters, but the City did not agree. [Cherne Dec., Exhibit 77.]

Defendant required unvaccinated firefighter to take a 3% pay cut in order to receive one of the positions. [Whitney, 30(b)(6), 178:11-24, Exh. 144.] Defendant emailed Plaintiffs (except

Teterin and Davis), asking them to indicate whether they were interested in one of the positions. [Carlson Dec. ¶23; Halifax Dec ¶14; Robillard Dec. ¶29; Parnell Dec. ¶20; Frei Dec. ¶36; Peterson Dec. ¶17; Teterin Dec. ¶22-28; Davis Dec. ¶33-36.] Plaintiffs timely expressed their interest in taking one of the positions. [Carlson Dec. ¶23; Halifax Dec ¶14; Robillard Dec. ¶29; Parnell Dec. ¶20; Frei Dec. ¶36; Peterson Dec. ¶17.]

Defendant reduced the number of positions to four (4) on November 15, 2021. [*Id.,* 183:11-19, Laird Exh. 7.] These positions were Training Lieutenant (current assignment), Training Lieutenant (temporary assignment that will sunset May 31, 2022), Training Firefighter (new assignment), and Telestaff 7 Workforce Dimensions (new assignment sunsets January 15, 2022). [*Id.*] Defendant issued another email on November 24, 2021, seeking a response which of the four positions they would accept "if offered." [Carlson Dec. ¶26-29; Halifax Dec ¶15-16; Robillard Dec. ¶31-33; Parnell Dec. ¶24-26; Frei Dec. ¶37; Peterson Dec. ¶17-18.] Plaintiffs timely said they were interested, [*Id.*] except Teterin and Davis who did not receive any notice. [Davis Dec. ¶33-36; Teterin Dec. ¶¶ 22, 28] Teterin received a notice of termination on October 27, 2021. [Teterin Dec. ¶24, 26.] Defendant informed Plaintiffs: "**By December 17, 2021, you will receive a confirmation if you were or were not selected for an assignment.**" [Hallifax Dec., Exh. I.]

On December 21, 2021, Defendant reversed course and issued notice that no positions would be offered until an individual returned from FMLA leave. [Carlson Dec. ¶31; Halifax Dec ¶16; Robillard Dec. ¶35; Parnell Dec. ¶27; Frei Dec. ¶38; Peterson Dec. ¶17-18.]  Even then, it would be subject to availability and seniority at the time each individual comes back from leave. [*Id.*] Laird, Defendant's 30(b)(6) witness as to the accommodations and communications thereto, testified that she did not know why the City did not assign the

positions after it received notice of which Plaintiffs were interested in them. [Laird, 30(b)(6), 14:11-15, 17:23, 196:10-17.]

Nine days later, on December 30, 2021, Chief Sheppard swore under penalty of perjury that the "positions **will be given to the unvaccinated firefighters** based on their seniority and availability as they return from FMLA or PFML." [Dkt 71-1, Sheppard Dec. par. 17 (emphasis added).] Laird, director of HR, also testified that these four positions were supposed to be given to the unvaccinated. [Laird, 30(b)(6), 197:7-10.]

On January 28, 2022, the Laird and others met to discuss the fact that the Plaintiffs were returning from leave in March. [*Id.* 204:2-17, Laird Exh. 38.] Laird then came up with an Action Plan to quickly ask Ben Norton if he wanted the open Training Lieutenant assignment. [*Id.* Exh. 38, p.3.] Laird's Action Plan also said to post the other Training Lieutenant position, but to not give special communication to the unvaccinated employees. [*Id.*]

On February 1, 2022, Norton was contacted by the RFD and told that he got the Training Position. [Norton Dec. ¶ 10.] Norton was very surprised and baffled as to why one of the unvaccinated firefighters who were on leave did not get it. [*Id.*] In October 2021, Norton had removed his application for the training position because he found out that it could accommodate the unvaccinated firefighters. [*Id.* ¶ 8-9.] He was told that no unvaccinated firefighter applied for it. [*Id.* ¶ 11.] Norton asked the RFD to please ask if any of the unvaccinated firefighters wanted the position, but the RFD responded that they weren't allowed to ask the unvaccinated because they were on medical leave. [*Id.* ¶ 11.] Norton accepted the position but only because he was told the unvaccinated firefighters did not want it. [*Id.* ¶ 12.] He was then promoted to Captain in the Training division. [*Id.* ¶ 14.]

The other Training Lieutenant position that was to accommodate the unvaccinated firefighters was posted on February 18, 2022 with an open enrollment period of February 18, 2022 through March 21, 2022, and a start date of April 1, 2022. [Laird 30(b)(6) dep, 216:9-217:5, Exh. 105.] Plaintiff Carlson was returning from leave and requested the Training Lieutenant position on March 4, 2022, well before the March 21, 2022, end of the open enrollment period. [*Id.*, 222:17-20; Carlson Dec. ¶33-34.] Laird punted to Chief Sheppard as to why Carlson did not get hired. [Laird 30(b)(6) Dep, 222:21-223:4.] Sheppard claimed at his deposition that Carlson never stated he was interested in a position. [Sheppard, Day 2, 19:2-20:5.] However, Sheppard sent an email to Carlson on March 8, 2022, stating "I see that you are interested in the day shift assignment. [*Id.* 20:9-25; Exh. 28.] Sheppard admitted that the Training Lieutenant position was still open at that time. [*Id.*21:1-3.] Yet, Sheppard sent an email the following day, March 9, 2022, stating "Currently, there is not work to fill more accommodated positions." [*Id.* 21:8-19; Exh. 28.] Sheppard conveniently could not recall why he told Carlson there was no position available when the position was still in open enrollment. [*Id.* 21:22-23:15.] Sheppard admitted that Carlson was a lieutenant who "was eligible to receive this position." [*Id.* 26:24-27:2.] Despite this, Sheppard hired Steven Guenther, a vaccinated firefighter, into the LOA position designated to accommodate unvaccinated firefighters, on April 1, 2022. [Whitney, 30(b)(6), dep. 30:21-31:9, 189:7-10] Guenther had not even applied at the time Sheppard told Carlson there were no positions available. [Sheppard, Day 2, 25:6-12.]

The City/Sheppard lied to the Plaintiffs that the Training Lieutenant was not available as they were coming back from leave, as all of them requested it before open enrollment ended on March 21, but were told it was not available: Frei requested it on March 9; Hallifax on March 13; Robillard on March 13; Parnell on March 18; and Peterson on March 20. [Frei Dec. ¶¶ 39-

40; Hallifax Dec. ¶¶ 19-20; Robillard Dec. ¶¶ 39-41; Parnell Dec. ¶¶ 33-34; Peterson Dec. ¶ 19.]

Tellingly, Fire Dept. HR analyst Kelsey Allen-Wesley told Robillard and Hallifax that the Training Lieutenant position was available. [Robillard Dec. ¶ 40, Exh. 12; Hallifax Dec. ¶19; Allen-Wesley Dec. ¶17-19.] Allen-Wesley, who worked with Laird and Sheppard regarding accommodating the Plaintiffs, stated that Laird and Sheppard seemed very frustrated with the unvaccinated firefighters and upset that they were pushing back and would not just get vaccinated. [Allen-Wesley Dec. ¶13-15.] It appeared to her that Sheppard and Laird were hesitant to bring the unvaccinated firefighters back to work. *Id.* In dealing with Sheppard, Allen-Wesley felt he acted annoyed with the unvaccinated firefighters. [*Id.* at 16.] This matches Chief Sheppard's testimony when he blamed the Plaintiffs for terminating themselves. [Sheppard, Day 1, Dep. 27:7-17.]

Laird and Sheppard then had interactive meetings with the unvaccinated firefighters returning from leave, except Carlson. [Hallifax Dec ¶23; Robillard Dec. ¶44; Parnell Dec. ¶37; Frei Dec. ¶42; Peterson Dec. ¶22.] The Mayor's Executive Order required Laird to have an interactive meeting with each unvaccinated firefighter, but Laird never had one with Carlson, nor could she say why at her deposition. [Laird 30(b)(6) 222:1-11.]

Defendant never offered any position to any Plaintiff. [Carlson Dec. ¶¶ 46-48; Hallifax Dec ¶¶12-13; Robillard Dec. ¶¶42-44; Parnell Dec. ¶¶18, 27, 37, 54; Frei Dec. ¶35, 55; Peterson Dec. ¶¶22, 30; Teterin Dec. ¶¶22, 27-28; Davis, Dec. ¶¶35-36; Laird 30(b)(6), 145:23-25] Defendant asked some of the Plaintiffs if they would be qualified and interested in the City's non-fire department job openings, but none of the Plaintiffs were qualified to perform any of the jobs on the list. [Hallifax Dec ¶¶24-26; Robillard Dec. ¶44; Parnell Dec. ¶¶38, 41-42; Frei Dec.

¶42; Peterson Dec. ¶¶22, 30; Teterin Dec. ¶19.] The COR never gave a list of available jobs to Carlson. [Carlson Dec. ¶¶41-42.]

One of the jobs was in the police department. Plaintiff Hallifax and Parnell stated they were interested in the police officer position and wanted more information. [Hallifax Dec. ¶26; Parnell Dec. ¶38-45] However, they were issued termination notices a few days after they expressed interest. [*Id.*] No one at the COR ever spoke to the police department, to see if it had jobs available to accommodate the unvaccinated firefighters. [Lowe, 30(b)(6), 105:3-5.] The unvaccinated firefighters were not qualified to work as police officers. [Lowe, 30(b)(6), 105:10-12.] They would have to go through a five-month police academy, but there was an approximately one year wait to get in. [Lowe, 30(b)(6), 105:18-106:3.] There was one unvaccinated firefighter who had recently been a police officer—Davin Alsin—who would not have needed to go to the academy. [Lowe, 30(b)(6), 106:4-23.] The police department had seven to ten openings at the time, but no one from the City ever discussed with the police department about having Davin Alsin work as a police officer as an accommodation. [Lowe, 30(b)(6), 107:5-16.] Alsin was told he could not be accommodated in the police department. [Peterson, Dec. 25.]

### i. Plaintiff Robillard Was Working In A Non-Emergency Administrative Position At The Time That Could Have Accommodated Him

On October 11, 2021, Laird and Sheppard met with Robillard in regards to his accommodation request. [Robillard Dec. ¶ 21.] Instead of allowing Robillard to stay in his administrative position, Robillard was told that there were no jobs available in the fire department for unvaccinated individuals. [Robillard Dec. ¶ 21.] He was given a list of twenty-five jobs in other city departments to review, but he did not meet the qualifications for any of

them, e.g. three jobs required 11 years of engineering experience. [Robillard Dec. ¶ 22, Exhibit 4.] Furthermore, fourteen (14) of the twenty-five (25) positions had application deadlines that had already passed. [Robillard Dec. ¶ 22, Exhibit 4.]

At the time of this interactive meeting, Robillard was working as a Training Lieutenant, an administrative non-patient facing position that was not subject to the Proclamation or the Mayor's Executive Order. [Sheppard, Day 2, 11:20-23; Robillard Dec. ¶¶ 2-4, 26.] He contractually had that position until January 1, 2022, but he also had contractual rights to renew his term for another 2 year term, which trumped the seniority rights of any other firefighter. [Whitney Depo. 28:9-10, 29:11-14.] This Training Lieutenant position was one of the positions Defendant identified the following week, as a position that could accommodate the unvaccinated firefighters. [*Id.* 178:13-20, Exh. 144.] However, it should have only been offered to Robillard as he had contractual rights to the position under the CBA. [*Id.*29:11-30:8.]

Nine days after this meeting, October 20, 2021, Defendant signed an LOA with the Union identifying Robillard's job as one that could accommodate unvaccinated firefighters. [*Id.*35:24-36:5; Sheppard, Day 2, 13:17-20, 14:11-15.] Robillard was never told he could come back to his position. [Robillard Dec. ¶¶35, 41, 44, 52.]. Instead, Defendant sent out a notice to the unvaccinated firefighters asking if they were interested in any of the five positions identified in the LOA and to respond by October 31, 2022. [Robillard Dec. ¶29]. The City required the unvaccinated to agree to a 3% pay cut if they wanted one of the positions as an accommodation. [Robillard Dec. ¶33]. Robillard felt this was discriminatory since he did not have to take a 3% pay cut to work in that position when he originally received it, so why should he have to take one now, just because he was unvaccinated. [Robillard Dec. ¶¶ 8, 33] Robillard emailed HR by the deadline stating he was interested in his current position of Training Lieutenant. [*Id.*].

Instead of allowing him to renew, Defendant officially removed Robillard from his Training Lieutenant position on January 1st, 2022. [Whitney 30(b)(6), Dep. 28:9-10.]

**F.  Defendant Could Have Accommodated Plaintiffs In Other Fire Department Positions.**

The Fire Department is organized into three branches: Operations, Emergency Management and Support Services. [*Id.* 56:12-18, Exh. 149, p. 4.] Only the Operations branch takes emergency calls. [*Id.* 56:24-57:9.] However, even under Operations, the Training Division did not typically provide emergency response services, but just Fire Suppression and Emergency Medical Services. [*Id.* 58:9-16; Whitney Exh 149, p. 4.] The Mayor testified that she never prohibited the fire department from allowing unvaccinated firefighters to work in jobs outside of a healthcare setting. [Birney, Dep. 84:17-20.]

**i.   Defendant Could Have Accommodated The Plaintiffs In The Training Division Under Operations But Failed To.**

Firefighters in the Training Division are not interacting with patients or providing medical aid. [Whitney 30(b)(6), depo. 153:3-8.] Defendant identified positions in Training to accommodate the Plaintiffs but it gave that position to vaccinated firefighter Steve Guenther instead. [*Id.* 30:21-31:9, 189:7-10] Defendant never even filled the other Training Lieutenant position in the LOA. [*Id.* at 189:11-18.]

Defendant never asked any vaccinated firefighters in the Training Division if they would be willing to switch positions with the unvaccinated firefighters in order to accommodate them. [*Id.* 60:19-61:3; Sheppard, Day 2, 28:8-12; Laird 30(b)(6), 77:22-78:5.] Nothing prevented the Chief from inquiring. [Sheppard, Day 2, 28:18-24.] Had Defendant asked, Norton testified he would have been willing to switch. [Norton Dec. ¶. 15.]

Defendant also could have placed one or more Plaintiffs on light duty and put them in the Training Division, just as it did with Hallifax when she needed an accommodation during her pregnancy. [Hallifax Dec. ¶¶ 31, 33.] She did not do any emergency response and did not have any patient contact. [*Id.*]

### ii. Defendant Could Have Accommodated The Plaintiffs In The Support Services Branch Which Does Not Provide Emergency Response.

The Fire Department had uniformed positions in the Logistics division and the Fire Prevention division of the Support Services branch that did not provide emergency response. [Whitney 30(b)(6), 56:24-57:9, 59:20-60:4; Whitney Exh 149, p. 4.] Fire Prevention employees work in City Hall, not in a fire station. [*Id.* 134:19-21.] Fire Prevention employees were even allowed to work remotely during the pandemic. [*Id.* Exh 149, p. 19.] There were no discussions about accommodating the unvaccinated firefighters with the remote work fire prevention was doing. [*Id.* 72:20-23.]

As of January 1, 2022, the Fire Department had two openings in Fire Prevention. [*Id.* 156:21-157:6.] The Fire Department needed more employees in Prevention because it was having to suspend some services due to staffing constraints. [*Id.* 72:24-73:8; Whitney Exh 149, p. 19.] Defendant never offered the Plaintiffs any job position in Fire Prevention. [Carlson Dec. ¶48; Halifax Dec ¶29; Robillard Dec. ¶42; Parnell Dec. ¶54, 56; Frei Dec. ¶43, 55; Peterson Dec. ¶30; Teterin Dec. ¶¶22, 27; Davis, Dec. ¶36; Whitney 30(b)(6), Dep., 157:3-6.] Defendant's person most knowledgeable doesn't recall why no assignments from fire prevention were designated to accommodate the unvaccinated firefighters. [Whitney 30(b)(6), 20:19-21:5, 184:13-24.]

Furthermore, there were nine deputy fire marshal positions in Fire Prevention that could have accommodated the Plaintiffs. [Whitney 30(b)(6), 57:7-17; Whitney Exh 149, p. 4.] Defendant never asked any vaccinated firefighter in any of those positions if they would be willing to swap positions with the Plaintiffs in order to accommodate them. [Whitney 30(b)(6), 60:19-61:3; Sheppard, Day 2, 28:4-7.] Plaintiffs would have been willing to work in fire prevention in order to be accommodated. [Carlson Dec. ¶48; Halifax Dec ¶¶31-32; Parnell Dec. ¶56; Frei Dec. ¶43; Peterson Dec. ¶30; Teterin Dec. ¶29.] Alison Hallifax had already worked in prevention before. [Hallifax, Dec. ¶¶31-32.] All the other Plaintiffs needed to do was complete a certification within so many months after beginning work in prevention. [Whitney 30(b)(6), 74:1-22.]

Defendant also could have placed one or more Plaintiffs on light duty in the Prevention Division, just as it did with Hallifax when she needed an accommodation during her pregnancy. [Hallifax Dec. ¶¶ 31, 32.] She did not do any emergency response and did not have any patient contact. [*Id.*]

## G. Defendant Could Have Accommodated Plaintiffs In Their Current Fire Department Positions.

City's 30(b)(6) witness testified: the only reason why unvaccinated firefighters could work with patients on or before October 17, 2021, but not after, was because of the Governor's Proclamation. [Laird 30(b)(6), 162:22-163:7.] Chief Sheppard also testified that the only reason he mandated the vaccine was because of the Governor's proclamation and the Mayor's executive order, not because of a health and safety risk. [Sheppard 140:24-141:6.] Sheppard incorrectly believed that the Governor's Proclamation did not allow unvaccinated firefighters to be accommodated in the patient care setting. [Sheppard, 186:6-187:1, 179:23-180:3, 188:8-15.]

Yet, Defendant's FRCP 30(b)(6) witness as to "Defendant's policies and procedures that fire department employees were required to follow related to mitigating the health and safety risk of Covid 19" and the reasons, basis and effectiveness of such policies, as well as to "Defendant's policies, procedures and practices for handling requests for accommodations to its Covid 19 vaccine mandate" [Whitney, 30(b)(6), 15:23-16:19, Whitney Exh. 2], testified that the City was not aware of any law that prevented it from allowing unvaccinated firefighters to provide direct patient care:

> 20· · · ·Q.· ·Was the City ever aware of any government law or
> 21· regulation that prevented it from allowing unvaccinated
> 22· firefighters with a religious accommodation from providing
> 23· direct patient care?
> 24· · · ·A.· ·Not that I'm aware of.
> 25· · · ·Q.· ·Was it the City's understanding that the
> ·1· governor's proclamation allowed for accommodations based on
> ·2· religion or medical that would allow firefighters to
> ·3· continue providing direct patient care?
> ·4· · · ·A.· ·I believe so.
> [Whitney, 30(b)(6), 114:20-115:4.]

Not only did Defendant's FRCP 30(b)(6) witness testify that the City understood providing direct patient care was an allowable accommodation under the proclamation, he also agreed that unvaccinated firefighters with religious accommodations could continue to provide direct patient care. [Whitney, 30(b)(6), 119:15-120:12.] Whitney testified:

> 15· · · ·Q.· ·And so you and [union] President Gary Anderson were in
> 16· agreement that unvaccinated firefighters could continue with
> 17· an accommodation following those PPE guidelines?
> 20· · · · · · THE DEPONENT:· Gary and I were in agreement as we
> 21· moved through this process of -- of working between the
> 22· Union and Management.
> 24· · · ·Q.· ·Okay.· And just so the record's clear, your
> 25· agreement was that the unvaccinated firefighters with
> ·1· religious accommodations could continue to provide direct
> ·2· patient care?
> ·3· · · ·A.· ·That was our intent.
> ·7· · · · · · THE DEPONENT:· That was our intent.· And as a

·8· labor -- as a labor team, that was our direction and our
·9· goal.
10· BY MR. CHERNE:
11· · · ·Q.· ·Did your opinion ever change at any point in time?
12· · · ·A.· ·I don't believe so.
[Whitney, 30(b)(6), 119:15-120:12.]

Furthermore, Whitney was also the Redmond Fire Department's Medical Services

Administrator ("MSA") during the pandemic. [Whitney, 30(b)(6), 43:14-16.] He was in charge

of the fire department's emergency medical services from January 1, 2020 to until January

2024. [Whitney, 30(b)(6), 43:17-24, 41:23-42:5.] He had significant responsibilities in regards

to the fire department's response to COVID, as it was his duty to keep up to date with the

different requirements coming from the government entities in regards to how to respond to

Covid. [Whitney, 30(b)(6), 44:10-14.] The health and safety of the workforce was his number

one priority and then the health and safety of the community. [Whitney, 30(b)(6), 45:1-2.] He

was part of the King County Fire Chiefs Association due to his position and they would

regularly meet to discuss how to best respond to Covid. [Whitney, 30(b)(6), 45:19-46:10.]

The Fire Department's HR Analyst at the time, Allen-Wesley, testified that she believed

the firefighters could have been accommodated in their roles with the safety protocols originally

agreed to. [Allen Wesley, Decl. ¶¶ 32-34.]

Ben Norton, a vaccinated Captain in the Fire Department, testified based on his

experience and training that the unvaccinated firefighters could have safely carried out their

duties following the RFD safety training and PPE requirements. [Norton Dec. ¶ 38.]

Plaintiff's expert witness, Dr. Mina, also opines that Plaintiffs could have been

accommodated in their roles, as daily testing was the most effective method for stopping the

spread of Covid. [Mina Dec. ¶124.] Defendant's own policies also agree, as one of the RFD key

messages throughout the pandemic was that tests are accurate in detecting the virus. [Whitney

30(b)(6), 147:5-8.] Due to the rise of the Omicron variant, the RFD required all vaccinated firefighters to start testing for Covid-19 before each shift, as of December 23, 2021. [*Id.*, Exh. 94.] Chief Sheppard and MSA Whitney agreed with the King County Public Health December 23, 2021, statement that Covid Tests were "highly effective for detection of all known COVID variance at this time." [Sheppard, Day 1, 113:16-114:24; Whitney 30(b)(6) 124:12-125:1.]

The COR 30(b)(6) witness testified that "there was not a flip of the switch" of associated risk that unvaccinated firefighters posed before October 18, 2021 as to after October 18, 2021. [Whitney 30(b)(6), 172:10-16.] Defendant never considered, when handling the firefighters request for religious accommodation, the fact that police officers were allowed to provide emergency medical services even though they were unvaccinated. [Laird, 30(b)(6), 66:5-13.]

### i. Defendant Allowed Unvaccinated Police Officers To Provide Emergency Medical Care.

During COVID, the Redmond Police Department ("RPD") had approximately 77 sworn officers working. [Lowe, 30(b)(6), 24:12.] Police officers are dispatched on 2 to 3 times the amount of calls as Redmond Firefighters. [*Id.* 108:17-109:10; Whitney 30(b)(6), 49:9-12.] All Redmond police officers are trained every two years to provide emergency medical aid. [Lowe, 30(b)(6), 82:11-14; 83:13-16.] Providing emergency medical aid is part of an officer's job duties. [*Id.* 83:17-19; Lincoln 38:2-6.] They are required to be certified in first aid, CPR, AED, and were allowed to obtain advanced certifications at RPDs expense. [Lowe, 30(b)(6), 84:13-20, 85:11-14.]

One of the RPD's goals was to provide emergency medical care when needed. [*Id.* 21:22-24.] "Preservation of life is our first priority, period, end of story, pandemic, not pandemic." [*Id.* 93:4-5.] A whole section of the police department manual, section 431, is

dedicated to "Medical Aid And Response", and states that police officers "often encounter persons who appear to be in need of medical aid". [*Id.* 81:5-20, Exh. 3.]

Police officers were/are first responders. [*Id.* 21:25-22:1.] During the pandemic they encountered persons that appeared to be in need of medical aid. [*Id.* 82:8-9.] For emergency medical calls were death is likely or imminent, or for vehicle collisions, police officers are dispatched to the scene. [*Id.* 111:17-24, 112:18-20.] In fact, during the time of the vaccine mandate, Redmond police officers were required by law to render medical aid in at least some situations. [*Id.* 75:4-18; Lincoln 40:20-41:7.] Police officers, including unvaccinated officers, also had the discretion to render medical aid in all other situations throughout the pandemic. [*Id.* 72:1-73:4; Lincoln 37:10-17.]

Police officers were always dispatched for cardiac arrest calls, because they can arrive on the scene faster 99 out of 100 times and start medical aid, which they were expected to do. [*Id.* 69:19-21; 70:8-10; 70:11-21; 72:1-13; 111:4-5.] During the time of the vaccine mandate, Fire Captain Ben Norton often observed police officers providing medical aid and CPR when he arrived on the scene. [Norton Decl. ¶ 26.] The COR required firefighter Norton to be vaccinated in order to provide medical aid to the same patients that unvaccinated police officers were allowed to assist. [Norton Decl. ¶ 4.]

Police officers, including unvaccinated officers, were required to "provide CPR or render aid" throughout the COVID pandemic. [Lowe, 30(b)(6), 14:1-7, 15:22-25.] Unvaccinated police officers were allowed to administer Narcan, to use an AED, to conduct sternum rubs, to perform rescue breathing **including mouth to mouth rescue breathing**. [*Id.* 86:7-90:21.] Unvaccinated police officers were also allowed to serve immunocompromised individuals during the time of the vaccine mandate. [*Id.* 57:10-15.] Police officers were not able

to socially distance in carry out many of their duties like making arrests, giving CPR, giving first aid, and conducting body searches. [*Id.* 50:1-7; 51:2-3, 18-25; 66:3-13.] Police officers were even allowed to take off their masks to carry out their job duties, regardless of whether they were vaccinated or not. [*Id.* 55:22-56:3.]

Besides providing medical aid, unvaccinated police officers were allowed to do many other tasks that the COR refused to allow unvaccinated firefighters to do because of an alleged health and safety risk. Unvaccinated police officers were allowed to ride in an ambulance with a person who needed medical aid [*Id.* 65:2-11], to transport members of the public in their police vehicles [*Id.* 61:11-25], to enter ambulances [*Id.* 64:12-22], to enter private homes [*Id.* 68:17-20], to enter private businesses [*Id.* 73:10-14], to enter nursing homes and assisted living facilities [*Id.* 73:16-25], to enter hospitals [*Id.* 74:1-2], to enter schools [*Id.* 74:3-4], to enter fire stations [*Id.* 62:3-10], to use restroom facilities at fire stations [*Id.* 63:11-14], etc. Unvaccinated police officers were also allowed to conduct strip searches and bodily cavity searches [*Id.* 66:3-13], and to take down subjects using all levels of force [*Id.* 76:14-20]. Indeed, unvaccinated police officers had no restrictions in what job duties they could do during the pandemic. [*Id.*, 41:23-42:1.] If an individual did not want an unvaccinated officer responding to their call, COR policy was to state that it could not disclose officer vaccination status but that it would ensure the officer was wearing appropriate PPE when on the scene. [*Id.* 118:20-119:10.]

Despite police officers performing many emergency medical services, the COR did not require them to be vaccinated. [*Id.* 31:15-17; Lincoln 37:3-17.] Steve Lincoln, a police officer during the pandemic was never vaccinated. [Lincoln 14:1-10, 20:3-7, 40:8-18.] Nothing prevented the COR from mandating police officers be vaccinated for Covid, as the Mayor had the authority to mandate it. [Lowe, 30(b)(6), 32:25-33:6, 132:21-24.] The COR didn't even care

enough to know whether or not police officers providing emergency medical care were

vaccinated. [Lowe, 30(b)(6), 19:16-18; 40:24-41:7.] The COR was never concerned about the

exposure of COVID to individuals who came into contact with police officers, nor that

unvaccinated police officers were rendering medical aid. [*Id.* 77:16-78:24.]

> ·8· · · ·Q.· ·And the fact that officers had discretion as to
> ·9· whether or not to render medical aid, that also was not a
> 10· concern to the City of Redmond even though it didn't know
> 11· the vaccination status of those police officers?
> 22· · · · · · THE DEPONENT:· I have to say no, it was not a
> 23· concern of -- of the City because of the protocols that we
> 24· had in -- in place.
> ·1· · · ·Q.· ·And the protocols, you're talking about masking
> ·2· and social distancing?
> ·3· · · ·A.· ·Correct.· Personal protective equipment and the
> ·4· fact that we expect the officers, you know, to utilize their
> ·5· discretion and provide the appropriate level of care based
> ·6· upon what they're -- they're faced with.
> [Lowe, 30(b)(6), 78:8-11, 22-24, 79:1-6.]

The reason why the police department did not mandate the vaccine is because it was not

subject to the Governor's Proclamation. [*Id.* 41:16-20.] Instead of vaccination, the COR just

required its police officers to wear PPE when providing emergency response to prevent the

spread of COVID. [*Id.* 42:13-43:21.] All police officers were required to utilize the same PPE

regardless of vaccination status. [*Id.* 47:7-14.] The COR found that the PPE police officers were

required to use was effective at preventing the spread of COVID-19. [*Id.* 98:24-99:3.] It did not

even require police officers to test for Covid, unless they had symptoms. [*Id.* 45:8-16.] Had the

COR mandated police officers be vaccinated, the police department would have provided

accommodations allowing unvaccinated police officers to wear the same PPE it was already

requiring, since that PPE was "universally known, widely accepted, as the appropriate PPE."

[*Id.* 130:14-25.]

The COR is not aware of any hardship the police department suffered because it did not mandate its police officers to be vaccinated for Covid-19. [*Id.* 104:25-105:5.] The COR never did anything to determine whether its unvaccinated police officers were compromising the health and safety of others. [*Id.* 60:1-23.]

**ii.  Defendant Was Removing Most Of The Covid Safety Precautions Well Before It Terminated Six Of The Plaintiffs.**

Besides Plaintiffs Teterin and Davis, the remaining six Plaintiffs were terminated after the COR was lifting all of its COVID safety requirements. Plaintiff Carlson was terminated on April 4, 2022. [Carlson Dec. ¶44.] Plaintiffs Robillard, Hallifax, Frei, Parnell, and Peterson were terminated on May 25, 2022. [Halifax Dec ¶28; Robillard Dec. ¶45; Parnell Dec. ¶53; Frei Dec. ¶54; Peterson Dec. ¶32.]

However, a few months before their termination, the City had already issued a "Return to Work" order on February 18, 2022, requiring all employees, whether vaccinated or not, "to return to work and cannot telecommute 100%, unless they have a medical certification." [Mayor Birney, 92:21-94:1, Exh. 163.] Even "vaccinated employees concerned about working around unvaccinated employees" still had to return to work. *Id.*

On February 23, 2022, Defendant issued a Parks and Recreation bulletin removing "COVID-19 vaccine verification requirements, which includes showing proof of vaccination or negative COVID test results for visitors in its recreational facilities and community centers" starting on March 1, 2022. [Mayor Birney, 94:7-95:16; Mayor Depo Exh. 159.]

On March 12, 2022, Defendant also dropped its masking requirement for all employees except firefighters. [*Id.* 91:16-21.] On that same day, Defendant dropped its masking requirement for all members of the public who enter City of Redmond facilities, including

individuals who participate in programs, leagues, or events. [*Id.* 97:10-14; Birney Exh. 160.] Even Bytes Café, **a COR senior care program**, did not require vaccination, negative COVID test, or a mask as of March 12, 2022. [*Id.* 97:18-98:14; Birney Exh. 160.] Thus, as of March 12, 2022, Defendant no longer required non-fire employees nor citizens to wear masks, show a negative COVID test, or be vaccinated for COVID in order to enter city facilities and participate in City programs. [*Id.* 98:7-14.] The COR determined it was safe because of the governor's and county's decisions, as well as because the Redmond community was 98% vaccinated. [*Id.* 98:15-99:3, 36:9-14; Whitney, 30(b)(6) dep. 49:21-50:7; Whitney Exh. 104.] However, the COR never considered the high vaccination rate of its residents in determining whether the unvaccinated firefighters could provide emergency care. [Mayor Birney, 36:17-21.]

On March 15, 2022, Defendant dropped its masking requirement for firefighters, except for during an emergency response. [Whitney, 30(b)(6), 129:4-9; Whitney Exh. 89.] Masking around the fire stations, while riding in apparatus, in city buildings, or in public locations was no longer required. *Id.* Even on an emergency response, Defendant no longer required the more protective N95 mask, but allowed firefighters to simply wear surgical masks, unless the patient care involved aerosolizing procedures. *Id.* Defendant also no longer required gowns to be worn as part of the PPE. *Id.*

Firefighters were also no longer required to test for Covid as of March 15, 2022, unless they had symptoms of illness. [Whitney, 30(b)(6), 135:21-24; Whitney Exh. 89.]. Because the COR no longer required vaccinated firefighters to test for Covid, it was unable to prevent asymptomatic firefighters from working with patients and it had to deal with the potential risk of asymptomatic firefighters spreading Covid. [*Id.* at 139:11-140:2, 19-20.] Asymptomatic transmission had previously been a real concern because firefighters had the potential to spread

Covid. [Id. at 146:4-21; Whitney Exh. 150.] The COR had vaccinated firefighters test positive for Covid after its vaccine mandate. [Whitney, 155:4-6.]

### iii. Other Surrounding Fire Districts And Hospitals Accommodated Their Firefighters, Including Some Plaintiffs, Allowing Them To Do Emergency Response Without Any Hardship.

The COR was aware that other fire agencies outside of King County were allowing their unvaccinated firefighters to work in patient facing positions as an accommodation. [Whitney 163:18-164:1.] These Fire districts were also subject to the Governor's Proclamation that mandated vaccination for health care providers. [Snohomish County Fire District 22 (aka "Getchell Fire") Depo, p. 22:17-20; City of Tacoma ("Tacoma") Depo, 23:17-20, Central Pierce Fire and Rescue ("Central Pierce") Depo., 20:18-21:3.] Like COR, these surrounding fire districts were also charged with protecting the health and safety of the residents in their territories. [Getchell Fire 30(b)(6) Depo 13:22-14:8; Central Pierce Depo 46:18-23.]

Central Pierce understood that it did not have to provide an accommodation if it would cause an undue hardship on it. [Central Pierce 23:7-10.] However, it determined that the personal protective equipment (PPE) of mask, gowns, goggles, and gloves would insulate it from any risk of spreading Covid-19. [Id. at 25:22-26:18.] Central Pierce allowed unvaccinated firefighters to provide emergency medical services following the PPE requirements and found that those measures mitigated the risk of spreading Covid-19 so that the risk was not an undue hardship. [Id. at 27:7-10; 40:4-11.] Central Pierce was unaware of any hardship or impact it suffered by allowing unvaccinated firefighters to work directly with patients. [Id. at 58:24-59:2; 53:13-17.] In 2021, Central Pierce responded to nearly three times the amount of calls as Defendant: 33,822 incidents of which 72% were medical related. [Id. at 40:15-24.] Central Pierce accommodated 61 employees, the majority of which were uniformed firefighters, and it allowed them to handle all emergency calls. [Id. at 39:25-40:7, 44:18-45:11.] Central Pierce

even accommodated Plaintiff Matthew Peterson, after he was fired by Defendant. [*Id.* at 55:5-56:23.] Central Pierce found his religious beliefs to be sincerely held, and he was allowed to do all the same job duties as a vaccinated firefighter as long as he wore the required PPE. [*Id.*] Central Pierce is unaware of any negative impact to its operations because it accommodated Peterson. [*Id.* at 56:24-57:3.]

Getchell Fire had about 75% of its firefighters request and receive a religious accommodation to the Covid vaccine mandate. [Getchell Fire Depo. 9:6-9, 18:17-19:4] Getchell treated all firefighters the same regardless of vaccination status: everyone had to mask and test each day. [*Id.* at 19:11-20, 31:15-18.] Getchell experienced no undue hardship to its business or operations because it accommodated unvaccinated firefighters. [*Id.* 20:14-17.] Getchell had no indication its safety measures were not effective, that the health and safety of the public was compromised, or that its workplace was compromised because of unvaccinated firefighters. [*Id.* at 31:19-32:15.] Unvaccinated firefighters were allowed to serve all members of the public including the immunocompromised, elderly, and even those with Covid.  [*Id.* at 29:11-24, 32:22-25.] After Plaintiffs Brian Robillard and Matthew Peterson were fired by Defendant for being unvaccinated, they were hired and accommodated by Getchell fire. [*Id.* at 33:4-34:3, 36:1-18, 36:24-37:3.] Getchell found that both Plaintiffs had sincerely held religious beliefs that prevented them from taking the vaccine. [*Id.* at 34:13-35:1, 36:24-37:25.] Allowing Plaintiffs Brian Robillard and Matthew Peterson to work with an accommodation did not negatively impact Getchell's operations. [*Id.* at 35:16-23, 38:1-4.]

The City of Tacoma also accommodated 52 firefighters requests for religious accommodation to the Governor's vaccine mandate. [Tacoma Depo., 85:25-86:5 (errata).] It never determined that accommodating firefighters would create an undue hardship. [*Id.* at

44:15-45:2.] It never revoked any firefighter's accommodation to its Covid-19 vaccine mandate because it created an undue hardship. [*Id.* 45:3-10.] In determining what accommodations to offer, the City of Tacoma followed the CDCs recommendations for health care providers. [*Id.* 47:1-21.] The recommended public health measures at the time were doing daily health checks and take weekly Covid tests, as well as wear the required PPE at the time. [*Id.* at 46:5-47:5.] Tacoma allowed unvaccinated firefighters to ride in vehicles with patients and vaccinated firefighters. [*Id.* 60:17-20.] There was no limitation of the types of interactions unvaccinated firefighters could have with the public or their co-workers. [*Id.* at 64:1-4.]

Evergreen Health operates a primary care facility, an urgent care facility, and an Emergency Department in Redmond.  Evergreen 30(b)(6) 19:18-23. It granted 314 religious exemption requests of the 324 it received from doctors, nurses and other medical providers, in compliance with the Proclamation. *Id.* 25:23-25, 74:10-11. All clinical employees requesting exemptions were allowed to continue working in their job positions which included patient care. Id. 26:12-15, 25,  27:25-5, 30:2-3. The unvaccinated employees were not restricted in the duties they could perform. Id. 42:20-43:13. Unvaccinated staff could take the antigen test as an alternative to wearing an N-95 mask. Id. 50:10-25. The 30(b)(6) never heard these protocols were ineffective at mitigating the spread of Covid-19. *Id.* 37:13-17. Ema Burcheci was allowed to work unvaccinated at the Redmond ER with Redmond firefighters during the Proclamation. [Burcheci Dec. ¶1-17.]

**iv.  The RFD Did Not Always Follow Dr. Rae's Advice In Regards To Responding To Covid.**

Defendant claims that it's decision to not allow unvaccinated firefighters to provide direct patient care when not fully vaccinated was because Dr. Thomas Rea and Dr. Michael

Sayre advised that this "**may** compromise workplace safety and put vulnerable patients at risk."

[Dkt 86, D's MSJ, p. 5.] Defendant also claims that it always followed Dr. Rea's advice in

regards to responding to the Covid-19 pandemic. [Whitney 30(b)(6), 165:11-14; Sheppard

114:11-15.] However, for both of these claims, the evidence shows otherwise.

      Chief Sheppard and the COR knew that the booster was available and that it was highly

recommended at the time Omnicron variant was at its height. [Whitney 30(b)(6), 168:14-20;

Sheppard, Day 2, 45:4-20.] The COR knew that the efficacy of the vaccines waned at this time,

yet it still did not require the booster shot. [Whitney 30(b)(6), 168:21-24.] Nothing prevented

the COR from following Dr. Rea's advice and requiring its firefighters to be boosted for

COVID-19. [Whitney 30(b)(6), 170:1-13.] But the City never followed that advice simply

because the Proclamation did not require it to. Sheppard testified:

> ·6· · · ·Q.· ·Okay.· Did you ever require your firefighters to
> ·7· be boosted for COVID-19?
> ·8· · · ·A.· ·No.· I don't think -- I don't think that was a
> ·9· requirement.
> 10· · · ·Q.· ·Why didn't you require it?
> 11· · · ·A.· ·Because it wasn't a requirement of the
> 12· proclamation?
> 13· · · ·Q.· ·Any other reason why you did not require it?
> 14· · · ·A.· ·No.
> 15· · · ·Q.· ·Was it your understanding that the vaccine
> 16· efficacy wanes over time for those who get vaccinated for
> 17· COVID?
> 18· · · ·A.· ·Yes.
> 19· · · ·Q.· ·And with that understanding, did anything prevent
> 20· you from requiring your firefighters to get boosted for
> 21· COVID?
> 23· · · · · · THE DEPONENT:· **As I said, it wasn't a requirement.**
> **24· So, therefore, I wasn't going to require it.**
> [Sheppard, Day 1, 147:6-24.]

## III.    STATEMENT OF THE ISSUES

1.  Are the Plaintiffs entitled to partial summary judgment of their prima facie case of failure to accommodate under Title VII and WLAD, because each Plaintiff had a sincerely held religious belief that conflicted with the vaccine mandate, each notified Defendant of that belief, and each Plaintiff suffered an adverse action?

2.  Are the Plaintiffs entitled to partial summary judgment as to liability on their failure to accommodate claims under Title VII and WLAD because Defendant did not make good faith efforts to accommodate?

3.  Are the Plaintiffs entitled to partial summary judgment as to Defendant's alleged undue hardship defense because Defendant did not plead an undue hardship defense?

4.  Are the Plaintiffs entitled to partial summary judgment as to Defendant's alleged undue hardship defense because Defendant could have accommodated the Plaintiffs without undue hardship?

## IV.    EVIDENCE RELIED UPON

Plaintiff's responsive motion relies on the evidence cited herein and filed with this brief, and the pleadings filed in this case.

## V.    ARGUMENT

### 1.    Plaintiffs are Entitled to Partial Summary Judgment on their Failure to Accommodate Prima Facie Case – Defendant's Claim it Offered Plaintiffs Reasonable Accommodations is Unsupported by the Facts

To establish a prima facie case of failure to accommodate, Plaintiffs must prove (1) a sincere religious belief; (2) they informed COR of the belief(s), and (3) the employer subjected the Plaintiffs to an adverse employment action, i.e., disciplinary discharge or forced retirement for Ms. Davis. *Peterson v. Hewlett Packard Co.,* 358 F.3d 599, 606. *See Kumar*, 180 Wash. 2d

481, 325 P.3d 193 (2014)(WLAD follows Title VII.) None of these elements are disputed or in doubt. Defendant does not contest the sincerity of Plaintiffs' religious objections to the Covid-19 vaccines. Laird Dep. 43:5-44:1. They assume it in their motion for summary judgment. Thus, Summary Judgment on the prima facie case is appropriate.

Defendant seeks to distort the factual record to "blame the victim," i.e., claim that it offered Plaintiffs accommodations that Plaintiffs unreasonably refused. Defendant contends it "repeatedly" offered Plaintiffs the four (4) positions designated in the LOA with the union. As the facts above show, it never actually offered them, instead, it actively prevented them from obtaining one.

As an initial matter, Defendant has not demonstrated any need to offer Plaintiffs alternate positions. Its own Medical Services Administrator, Jim Whitney --  the one actually responsible to keep both the firefighters and employees safe – agreed that the unvaccinated firefighters with religious accommodations could continue to provide direct patient care. [Whitney, 30(b)(6), 119:15-120:12.] Whitney's perspective is supported by Plaintiffs' expert, Dr. Michael Mina, who states: "The original accommodations provided by the City to the Plaintiffs in this suit represent the **gold standard** of safety to protect against transmission of the virus which the vaccine lacked entirely." Mina Dec. par. 72. Dr. Mina further observed: **"**Rapid antigen tests have a sensitivity to detect infectious levels of virus that **exceed 90% overall and approach 100% sensitivity** in individuals testing positive when they are most infectious."

The vaccines were far less effective: "By late 2021—during early Omicron circulation—two-dose vaccine effectiveness (VE) against symptomatic Omicron infection had declined to only approximately 30–40 percent within just a few months post-vaccination." Mina Dec. Par. 32. Moreover: "By late 2021 and into 2022, COVID-19 vaccines no longer conferred meaningful protection against SARS-CoV-2 acquisition or onward transmission for the Omicron variants (which quickly dominated the entire variant landscape) and minimal benefit for the Delta variant." Mina Dec. par. 37.

Dr. Mina explains the science in paragraphs 69-81, and in paragraphs 82-93. He states his opinion at par. 123: "Non-pharmaceutical interventions – including high-frequency daily rapid antigen testing before shifts, plus properly fitted N95 respirators especially when in close proximity to others – would have provided superior protection against workplace transmission than the largely vaccine and no-serial testing approach taken, with combined strategies potential capable of preventing over 95 percent of potential exposures in high-risk settings.

Objectively, then, the unvaccinated firefighters whose accommodation required them to test before each shift posed a far *lesser* risk of transmitting the Covid-19 virus than vaccinated firefighters who were not required to test, except for a brief three month period. Thus, there was no need to find alternate positions for the Plaintiffs – they could have been safely accommodated right where they were, as the City and the Union initially agreed.

Even before the City imposed its vaccine mandate on firefighters, October 20, 2021, city officials acknowledged that "the RFD did an exceptional job of mitigating the spread of Covid-19. [Whitney 30(b)(6) Depo., 65:21-66:24.] So exceptional that the City was unaware of any viral transmission between firefighter and patient "at anytime throughout the pandemic." [Whitney 30(b)(6) Depo., 64:3-9.]

Not only was a transfer completely unnecessary as an accommodation, by also requiring an arbitrary 3% pay cut for positions that other firefighters were not required to suffer a similar pay cut, the proposed transfers constituted adverse actions. *See, Muldrow v. City of St. Louis*, 601 U.S. 346, 143 S.Ct. 2686 (2024). The proposed 3% reduction in pay is also direct evidence of retaliatory animus, as argued below.

### A. Defendant Identified Four (4) Positions as Suitable for Unvaccinated Firefighters as they were not Patient Facing – but Never "Offered" them to any of the Plaintiffs – instead blocking Plaintiffs from Filling any of them

Defendant falsely claims Plaintiffs chose to take FMLA leave rather than accept one of the four (4) positions. First, consider the math. Defendant identified four positions to accommodate how many unvaccinated firefighters?  Eight firefighters are plaintiffs in this lawsuit. One of the four positions, the Workforce Dimensions position (WFD) expired three

months later. A second one of the four --a Training position – had been occupied by Plaintiff Brian Robillard, who should never have been required to be vaccinated in the first place, since he was not in a patient facing role. Robillard was entitled to return to his own position but was not permitted to do so. Instead, the position was given to a vaccinated firefighter. That left two remaining positions for seven (7) firefighters.

Plaintiffs Davis and Teterin never received any notice from Defendants about any of these positions. Accordingly, Davis submitted her early retirement in December, 2021, rather than be terminated.

Next, consider the timing. On September 30, 2021, Redmond offered the unvaccinated firefighters two choices: get vaccinated by October 18, 2021 or be terminated. The very first time any alternative positions were identified was in an LOA with IAFF LOCAL #2829, on October 20, 2021. Yet, by that time, all of the Plaintiffs had submitted for FMLA leave, and although approvals were lagging, none of them remained on the job. They could not have sought FMLA as an alternative to these positions as Defendant contends, because they didn't know about them when they submitted their leave requests.

While Plaintiffs were on leave, they were asked to indicate their interest in one of the positions, and Laird admits they all responded in the affirmative. Yet, she had no explanation for why they were not offered a position at that time.

Subsequently, on December 21, 2021, Defendant issued notice that it would not offer any positions to those on FMLA leave until they returned. Thus, Defendant's argument equally fails with respect to those Plaintiffs who extended their FMLA leave with PFMLA. They had all indicated a desire to work in one of the available positions.

When the firefighters did return from leave and met with Defendant, they were told there no positions available to them – that the four positions had been filled. *See,* Doc 71-1 Exh 3, par 36 -- Allison Hallifax, par 53 Tyler Parnell, and par. 70, Matthew Peterson. Meanwhile, prior to Plaintiffs returning from leave, the Training Lieutenant position was offered to vaccinated

firefighter Ben Norton, instead of to Brian Robillard who had previously been in that position until told he had to vaccinate or be fired.

Scott Carlson was due to return to work on March 14, 2022, the first to come off medical leave. On March 4, he responded to HR that he wanted one of the available positions, despite the 3% pay cut. On March 8, he reached out to Deputy Chief Healy as he was instructed, and got a reply from Chief Sheppard later that same day telling him there were no positions. How could he turn down a position when he was told there were none? On March 19, Chief Sheppard told Plaintiff Joshua Frei the very same thing – there were no jobs available.

Tyler Parnell was among those given a list of city jobs outside the fire department that he could apply to. None of the Plaintiffs were qualified for these jobs, many of which had already expired at the time the list was given to them. As Parnell discovered, he could have qualified for an entry level police officer position, except that by the time he could get accepted into the police academy, he would have long before been fired. Art Teterin worked his last shift on October 13-15, prior to the vaccine mandate taking effect on October 18th. He was terminated on November 2d, without ever being offered an alternative. Plaintiff Davis never got notice concerning any of these jobs, so to avoid termination, she submitted for early retirement.

In sum, Defendant's claim that it offered alternate jobs as accommodations to each of the firefighters lacks any support in the record. Defendant has utterly failed to identify a specific job it offered to a specific plaintiff, or to document any of the plaintiffs declining an actual  job offer. It simply didn't happen.

Defendant has, therefore, failed to contest any element of Plaintiffs' prima facie case. Defendant understood that each Plaintiff requested religious accommodation, and has never doubted that each Plaintiff is sincere in their religious beliefs. Each Plaintiff suffered an adverse employment action. The remaining plaintiffs were all terminated except Joshua Frei. Defendant issued Frei a notice of termination, which is an adverse action, but Frei was able to fly to Copenhagen and receive a vaccine there that did not violate his religious beliefs.  Plaintiffs are

therefore entitled to partial summary judgment with respect to their *prima facie* case of failure to accommodate.

### 2. Plaintiffs are Entitled to Partial Summary Judgment on their Retaliation Claims Because of the Direct Evidence that Defendant Would Not Permit Them to Continue Working Unless They Were Vaccinated

This is not simply a case where Defendant, acting in good faith, made bad decisions as to whether it could reasonably accommodate Plaintiffs' religious beliefs not to receive the Covid-19 vaccine. Instead, the evidence demonstrates that repeatedly, Defendant acted to subject Plaintiffs to the coercive choice between their religion and their job, and if they refused to get vaccinated, they would be out of a job.

Defendant acted in good faith, when in response to Plaintiffs' religious accommodation requests, they developed an accommodation scheme to permit them to continue working in their existing patient facing roles. But that's where the good faith ended.

Mayor Birney's executive order did not apply a consistent restrictive public health policy to all first responders, nor did it simply implement Governor Inslee's Proclamation in a consistent manner. Instead, it singled out the small group of unvaccinated firefighters who had submitted religious accommodation requests. Mechanics who serviced fire department vehicles were also subject to the Governor's mandate, as were police officers who rode in aid cars (ambulances), but the City did not enforce these provisions of the Governor's order. [Laird, 30(b)(6), 71:11-17; Sheppard 51:20-52:3; Lowe, 30(b)(6)] 64:12-22, 65:2-11; Lincoln depo., 14:7-10, 66:7-19.] By singling out the small group of firefighters seeking religious accommodation, Mayor Birney's executive order is retaliatory on its face, and as such, constitutes direct evidence of retaliation.

The retaliation didn't stop there. The same day Mayor Birney issued her executive order, she signed a Letter of Understanding ("LOU") with the Union subjecting the unvaccinated firefighters to a Hobson's choice:  get vaccinated or get terminated. Defendant did not replace one accommodation protocol with an alternate – it simply pressured the unvaccinated

firefighters to violate their faith as a condition of continued employment, the very definition of religious harassment. *See,* EEOC Guidance Chapter 12, Harassment.[1]

> Title VII is violated when an employer or supervisor explicitly or implicitly coerces an employee to abandon, alter, or adopt a religious practice as a condition of receiving a job benefit or privilege or avoiding an adverse employment action.[ ]

The deadline for compliance was October 18, 2021. That Defendant subjected Plaintiffs to religious coercion, a form of harassment, is also direct evidence of retaliation. Moreover, Defendant did not propose any alternative means of religious accommodation until *after* the October 18 deadline for vaccination had passed. Defendant waited until two days *after* the October 18th deadline to identify five (5) non patient facing positions that could accommodate the Plaintiffs. By that time, all but one of the firefighters had taken FMLA leave due to the mental health issues caused by the threat of losing their jobs. The list of five (5) alternate positions quickly was reduced to four (4) on November 15th.

There are some obvious problems with the list. 1) it included a position that was slated to end in three (3) months, hardly an accommodation; 2) it included Brian Robillard's own Training Lieutenant position, which Defendant refused to give back to Robillard; 3) thus, there were only two additional positions for the eight (8) plaintiffs, clearly an inadequate effort to accommodate designed to fail; 4) the firefighters were told they would have to accept a 3% pay cut, in violation of the union contract, to work positions their vaccinated colleagues worked without such a pay cut; and 5) there were other non patient facing positions that could have been offered to the firefighters in Fire Prevention that were never included. It is not surprising, then, that none of the Plaintiffs were able to obtain one of these jobs. That was the obvious design, not a flaw, and not, as Defendant contends, attributable to Plaintiffs' own fault.

---

[1] https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_72770023523091610748854783, last accessed April 28, 2025

PLAINTIFF'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 36

The Plaintiff who did not go out on leave was Artem Teterin. When faced with the ultimatum to either get vaccinated or quit, Teterin refused. In retaliation, Defendant did not tell Teterin there were non patient facing jobs he could transfer to. Instead, Defendant promptly issued Teterin a notice of termination. He was gone.

The retaliation against the other firefighters was similarly egregious, if not so immediate, given the delay inherent in their taking medical leave.

Brian Robillard was in an administrative, non patient facing position as a Training Lieutenant. That did spare him the wrath of the Defendant's vaccine frenzy. Even though he should not have been included in the vaccine requirement in the first place, because he submitted a religious accommodation request, he was lumped in with the rest, and compelled to get vaccinated by October 18th, or be fired. Even after the City identified his very position as one of the four (4) non patient facing roles where the unvaccinated firefighters could be accommodated, Defendant did not restore Robillard to his position. Instead, Defendant declined to extend the term, and while the Plaintiffs were on leave, placed a vaccinated firefighter in that position. Defendant's refusal to restore Robillard to his own job is direct evidence of retaliation.

After each of the Plaintiffs on medical leave informed Defendant of their interest in one of the positions, Defendant decided that it would not assign any position to someone on leave. Then, knowing when the Plaintiffs would return from leave, when they inquired about being placed in one of the available positions, they were each told by Chief Sheppard that there were no positions available. That none of the Plaintiffs obtained any of these four (4) positions, or any other non-patient facing role, is due to the Defendant's effective retaliatory policy designed to insure they would either be vaccinated of lose their jobs.

There simply is no other way to interpret the plain facts of this case – Defendant did not merely fail to accommodate the Plaintiffs – it acted intentionally, abusively and in a coercive manner identified by the EEOC as a form of harassment – to retaliate against each one, to insure they would not continue working unless they were vaccinated.

**3. Plaintiff is Entitled to Dismissal of the Affirmative Defense of Undue Hardship.**

Defendant revoked its agreement to provide Plaintiffs a religious accommodation regime that Dr. Mina said is the "gold standard" of Covid-19 safety protocols. Defendant did this even though its experience prior to the vaccine mandate was that the existing protocols were extremely effective at keeping everyone safe. Defendant's undue hardship argument is predicated on fear and speculation. Plaintiffs do not dispute that the Covid-19 pandemic posed serious risk of illness and death, nor do they contest the mortality statistics. These have no bearing on the fact that the accommodation approved by Defendant was safe, safer than having unvaccinated firefighters not being tested. Defendant has not presented sufficient evidence to prove otherwise. Its undue hardship defense should be dismissed.

## A.  Defendant Failed to Sustain its Burden to Prove Undue Hardship.

"Undue hardship is an affirmative defense…" to a claim of failure to accommodate an employee's religion. *Bolden-Hardge v. Off. of California State Controller*, 63 F.4th 1215, 1224 (9th Cir. 2023).  "The defendant bears the burden of proving an undue hardship." *See Balint v. Carson City*, 180 F.3d 1047, 1051 (9th Cir. 1999). *William Enriquez v. Gemini Motor Transp. LP,* 2021 WL 5908208, at *12 (D. Ariz. Dec. 14, 2021). In demonstrating an accommodation poses a disqualifying hardship, speculation is not enough. (*EEOC v. Abercrombie & Fitch Stores, Inc.* (N.D. Cal. 2013) 966 F.Supp.2d 949, 962.) Rather, the employer must point to concrete damage that would result. (*Opuku-Boateng v. State of Cal.*, *supra*, 95 F.3d at p. 1474; *Burns v. Southern Pac. Transp. Co.* (9th Cir. 1978) 589 F.2d 403, 406-07.) Hypothetical hardships based on assumptions from untried options will not do. (See *Abercrombie*, *supra*, at p. 962; *Anderson v. General Dynamics Convair Aerospace Div'n* (9th Cir. 1978) 589 F.2d 397, 402.)

The Supreme Court clarified Title VII's undue hardship standard in *Groff v DeJoy* 143 S.Ct. 2279 (2023). The Court stated that the burden "would have to rise to the level of hardship, and adding the modifier "undue" means that the requisite burden, privation, or adversity must

rise to an "excessive" or "unjustifiable" level." *Groff v. DeJoy*, 143 S.Ct. 2279, 2294 (U.S., 2023).

**B. Defendant did not Revoke Plaintiff's Approved Accommodations Due to Health and Safety Concerns, and Cannot Prove Post Hoc that Such Concerns Justified Removing Plaintiffs From their Positions**

Defendant claims it made the decision to remove Plaintiffs from their patient facing roles due to health and safety concerns. But this claim is unsupported by the record. There is no witness testimony or declaration supporting this claim.

The record does establish that Chief Sheppard misunderstood Governor Inslee's proclamation to prohibit permitting firefighters to work in patient facing roles, a view the City did not agree with. [Laird, 30(b)(6), 107:2-20, 113:19-23; Laird Exh. 122.] Based on this view of the Proclamation, Chief Sheppard worked to revoke the religious accommodations approved by the City, and requested and obtained a letter from Dr. Rea *after* Plaintiffs accommodations had been approved, to bolster his position. He did this contrary to the understanding of his own Medical Services Director, Jim Whitney, who testified as the City's 30(b)(6) witness, that unvaccinated firefighters could continue to provide direct patient care. [Whitney, 30(b)(6), 119:15-120:12.]

Prior to this time, both the Mayor and the COO Malisa Files had agreed to allow unvaccinated firefighters to continue working in the healthcare setting with a religious accommodation pursuant to the Governor's Proclamation. [Laird, 30(b)(6), 107:2-20, 113:19-23; Laird Exh. 122.] On that basis, Defendant evaluated and approved Plaintiffs' religious accommodation requests and entered the agreement with each of them specifying the intensified safety protocols they would have to comply with, including testing prior to every shift.

Chief Sheppard reached out to Dr. Rea on September 23, 2021, three days after the City approved Plaintiffs' accommodations, and obtained a letter from him purporting to support the decision he had already made – to remove unvaccinated firefighters from their posts. Notably, in his declarations and deposition testimony, Chief Sheppard nowhere states he made his decision based on health and safety concerns. He submitted a document purporting to show

Covid-19 infection data from September, 2021, but stops short of saying he possessed such data, or relied on this data for making any decisions. Dkt 71-1, Exhs. 1 and 6.[2]

Chief Sheppard did not make any decisions based on Dr. Rea's letter, instead, he used the letter as a pretext.  Nevertheless, Dr. Rea's letter is vague and inconclusive, and does not support Chief Sheppard's decision. The letter states that unvaccinated firefighters are eligible to have their religious accommodation requests evaluated, and if approved, to have a determination as to whether they can safely work in patient facing roles. It stops short of saying the unvaccinated firefighters cannot work in patient facing roles.

Defendant has not produced anything other than vague generalities about the severity of the pandemic to support its decision to remove the unvaccinated firefighters from patient facing roles. It has failed to produce any evidence that it made a serious analysis of the available data, or that it made a determination in consultation with medical experts. Even with respect to the letter from Dr. Rea, Chief Sheppard does not testify that Dr. Rea advised him to remove firefighters from patient facing roles, nor does he testify that he reviewed any scientific evidence with Dr. Rea in making the determination.

To the contrary, Defendant's own Medical Services Director Jim Whitney testified as the 30(b)(6) witness that the unvaccinated firefighters could have been safely accommodated in their patient facing roles! [Whitney, 30(b)(6), 119:15-120:12.] And Dr. Mina describes the City's approved accommodations as "the gold standard of safety to protect against transmission of the virus…" Mina Dec. par. 72.

The City's initial decision to accommodate Plaintiffs in their own patient facing positions is amply supported by the Fire Department's own experience during the first eighteen months of the pandemic. Not only did the Department do an exceptional job at mitigating the

---

[2] The data itself was skewed because unvaccinated persons were tested far more often than vaccinated, as Dr. Mina documents in his declaration, par. 94-100. When the County's vaccine mandate was lifted, testing showed that vaccinated and unvaccinated were infected at the nearly same rate, 1 to 1.1.  *ibid,* par. 99, 100.

spread of Covid, and at utilizing Covid exposure control measures, but recorded not a single incidence of viral transmission from firefighter to patient or from patient to firefighter.

[Sheppard Depo, 79:15-80:4; Whitney 30(b)(6) Depo., 64:3-9; 65:21-66:24.]

### C. Defendant Cannot Satisfy the Rigorous Standards of Undue Hardship in *Groff v DeJoy*, Requiring Proof that the Risk to Health and Safety Would be Unacceptable, Unjustifiable and Excessive.

The legal standard of undue hardship requires the City to prove the health and safety risk associated with the City's own approved accommodations rose to an unacceptable level, that was "unjustifiable" and "excessive." *Groff, supra.* Even its after-acquired expert, Dr. Lynch, is of no help in this endeavor. At most, Dr. Lynch's testimony establishes that the City was right to be concerned about health and safety, because there was a spike in infections due to the Omicron variant in January, 2021.  But Dr. Lynch stops far short of quantifying the risk or establishing that the risk could not be adequately managed. Moreover, Dr. Lynch acknowledges the reality of "breakthrough transmissions," i.e., caused by vaccinated persons. It is undeniable, then, that the vaccine mandate itself did not eliminate the risk of a firefighter transmitting the virus.

Dr. Mina thoroughly explains the science supporting his conclusion that "Vaccination was not a more effective method of eliminating transmission risk than frequent daily testing and use of PPE." Mina Dec. par. 68. Indeed, "…by late 2021 and early 2022, COVID-19 vaccines no longer conferred meaningful reduction in either acquisition or infection or onward transmission for the Delta and Omicron variants." Mina Dec. par. 67. Indeed, the vaccines had been tested and developed to prevent serious illness, not to prevent "acquisition or transmission." Mina Dec. par. 121.  Dr. Mina makes it clear throughout his declaration and expert report that he is a strong supporter of the vaccines to prevent serious illness, but not vaccine mandates.

As Dr. Mina also observes, the City's alleged concern about the health and safety of its firefighters and the general public is undermined by the inconsistent and contradictory

application of its vaccine mandate policies. Mina Dec. par. 126. The City did not require police officers to be vaccinated, nor were nurses in hospitals serving city residents required to be vaccinated. Thus, a vaccinated firefighter could be required to ride in an ambulance with an unvaccinated police officer, serving an unvaccinated member of the public, and bring the patient to a hospital where the patient is delivered to an unvaccinated nurse.  [Lowe, 30(b)(6)] 64:12-22, 65:2-11; Lincoln depo., 14:7-10, 66:7-19.] As documented in the Statement of Facts, above, police officers are dispatched to render medical aid, for cardiac arrest calls, for auto accidents, and have many situations where they are in close contact with the public, without masking.

The Defendant's rationale for not requiring police officers to be vaccinated was that the Governor's proclamation did not require it. This confirms Plaintiffs' contention that health and safety was not Chief Sheppard's primary concern in opposing and blocking Plaintiffs' accommodations.

Dr. Mina goes much further than Dr. Lynch at analyzing the meta-data. As he advised both U.S. Presidents Trump and Biden, and countless institutions and countries, a rigorous program of serial testing – the very thing required by the City's approved accommodation – was the "gold standard" at reducing the risk of an infected person transmitting the virus. It bears repeating that "Rapid antigen tests have a sensitivity to detect infectious levels of virus that **exceed 90% overall and approach 100% sensitivity** in individuals testing positive when they are most infectious." Mina Dec. par. 75.

Defendant cannot sustain its burden to prove that following through on its approved accommodation plan would result in an undue hardship because, in fact, this approach was *safer* than the vaccine only approach utilized by the City for many months both before and after its brief flirtation with a daily testing requirement between late December, 2021, and the end of February, 2022.

### D.  The Record is Equally Silent as to Whether Defendant Engaged in any Scientific Analysis in April and May, 2022, When it Terminated Plaintiffs

Defendant's position is it was entitled to rely on what was scientifically known at the time of its decisions. But instead of introducing evidence of the scientific data it actually relied on at the time, it proffers the testimony of Dr. Lynch, whom it never consulted at the time.

When the Plaintiffs who took medical leave were approved to return to work in March, April and May of 2022, the record is silent as to whether Defendant made any inquiry as to the state of the pandemic, and what safety measures were warranted.

By March, 2022, the pandemic was in a very different place than in September, 2021. The Delta variant had given way to Omicron, a January spike in infections had subsided to the point where Redmond began to loosen up on its vaccine mandates. The city ended remote work by a "Return to Work Order" issued on February 18, 2022. [Mayor Birney, 92:21-94:1; 163.] On February 23, Defendant removed the vaccine mandate for visitors at its recreational facilities and community centers. And on March 12, 2022, Defendant dropped its mask requirement for all members of the public who enter city facilities, and for all city employees *except* firefighters. The same day, the City dropped Covid-19 safety protocols at the Bytes Café, a senior care program. Vulnerable seniors were no longer required to mask, test or show proof of vaccination to participate. Yet, there is no evidence that Defendant considered any of the evidence it relied upon to lift the above vaccine safety protocols when evaluating whether to accommodate Plaintiffs in March and April, 2022.

Clearly, Defendant rightly perceived that the pandemic was ending, but refused to let up the pressure on firefighters to either get vaccinated or be fired. Chief Sheppard declares simply that the city held meetings to see whether those firefighters returning from leave could be accommodated.[3] The Plaintiffs report that these were stonewalling efforts. Tyler Parnell provided significant current data supporting his request to be returned to his patient facing role in the fire station, and at the conclusion of his meeting, asked to be told whether his request

---

[3] This statement is inadmissible hearsay, and should be excluded.

would be granted, so that he could pursue one of the alternate city jobs if it was denied. Defendant neither offered Parnell a particular job or accommodation, or the courtesy of a formal denial of his own request. It simply terminated him.

Through and through, the Defendant's conduct in this matter was not a good faith effort to accommodate that failed, but a scheme to require all firefighters to get vaccinated, or else. The hardships suffered here were experienced by the Plaintiffs upon loss of their jobs and their careers. The only other hardships suffered were by Redmond residents deprived of the efforts of these faithful public servants. The City itself did not suffer a hardship by rejecting the "gold standard' approach to Covid-19 safety protocols in favor of harassing Plaintiffs to violate their faith as a condition of keeping their jobs.

### E. Defendant has waived any Undue Hardship Defense by Failing to Plead It as an Affirmative Defense

As stated above, "Undue hardship is an affirmative defense…" *Bolden-Hardge, supra, 63 F.4th at 1224 (9th Cir. 2023)*. F.R.C.P. Rule 8(c) requires a defendant to affirmatively plead any affirmative defenses. Typically, failure to plead an affirmative defense results in waiver of the defense. *Wakefield v. ViSalus*, 51 F.4th 1109, 1119 (9th Cir. 2022). Although the waiver rule is not absolute, Defendant's conduct in this case has prejudiced Plaintiffs such that the court should find Defendant has waived its undue hardship defense.

Because of the need to add plaintiffs to this litigation, there have been three distinct complaints filed. At no time did Defendant plead undue hardship as an affirmative defense. In answer to the initial complaint, Dkt 33, Defendant responded to Plaintiffs' introduction summarizing its view of the case by stating, in part: "Defendant was unable to reasonably accommodate Plaintiffs' religious beliefs in their positions as providers of emergency medical services without creating an undue hardship."  Dkt 33, par. 1. This would have been sufficient to put Plaintiffs on notice that Defendant intended to pursue an undue hardship defense – EXCEPT:

Defendant never filed an Answer to Plaintiffs' First Amended Complaint. Plaintiffs' Second Amended Complaint ["SAC"] was filed on August 7, 2024. Dkt 58. Defendant filed an Answer to the SAC on October 22, 2024, approximately six weeks late.  In its answer, Defendant again failed to assert an undue hardship defense. Moreover, Defendant also changed its answer to Plaintiffs' introduction and omitted the prior reference to undue hardship. Instead of signaling to Plaintiffs that it would pursue an undue hardship defense, Defendant stated, in pertinent part: "that the City subsequently provided additional accommodations. Instead of applying for those accommodations, Plaintiffs went on FMLA or PFML leave." Dkt 65, par. 1. Defendant's Answer to the SAC clearly communicated to Plaintiffs and their counsel that Defendant was not defending this matter on the basis of an undue hardship defense, but on the basis that Defendant had offered suitable accommodations. As such, it proved to be misleading.

It wasn't until Defendant filed a summary judgment motion on January 31, 2025, that Defendant first asserted an undue hardship defense. Dkt. 69.

Accordingly, Plaintiffs sought to obtain deposition testimony, pursuant to F.R.C.P. Rule 30(b)(6) on the subject of undue hardship. Defendant first designated Fire Chief Sheppard as the appropriate witness, but then designated Jim Lynch, its Medical Services Administrator. Yet when Lynch appeared to give testimony, he said he was not competent to testify on the subject of undue hardship. Accordingly, to this day Defendant has neither objected to Plaintiffs' 30(b)(6) deposition notice, nor has it designated any witness to provide testimony on the subject. Cherne Dec. par. 1-6.

Plaintiffs specifically noticed seeking the following testimony:

19. The circumstances and facts as to any/all hardship or burden Defendant determined it would suffer as to any/all possible accommodations for each Plaintiff's objection to Defendant's vaccine mandate, as well as:
    a.  who made such determination;
    b.  how such determination was made; and
    c.  when such determination was made.

Defendant's failure to produce a witness on these topics has clearly prejudiced Plaintiffs' ability to oppose the defense. Plaintiffs have been unable to ascertain what sort of contemporaneous analysis Defendant may have made, and what data or information it may have utilized. Hence, Plaintiffs contend this court may properly find that Defendant has waived the defense, and grant Plaintiffs' motion to dismiss it.

Alternatively, Defendant's conduct undermines Defendant's contention it has produced sufficient evidence to sustain an un-plead undue hardship defense. Thus, Plaintiffs' motion to dismiss the defense should be granted, whether or not the court finds Defendant has waived the defense.

## VI.    CONCLUSION

Plaintiffs are entitled to partial summary judgment on their prima facie case of failure to accommodate Also as to the undue hardship defense that was never pled. And as to Retaliation. Defendant's motion should be denied.

Dated: April 28, 2025
Respectfully submitted,


                                                    *s/ Jonathon Cherne*
                                        By:    _____
                                                    Alan J. Reinach, *pro hac vice*
                                                    Jonathon Cherne, *pro hac vice*
                                                    CHURCH STATE COUNCIL

                                                    Tracy Tribbett WSBA # 35922
                                                    PACIFIC JUSTICE INSTITUTE
                                                    6400 Three Rivers Dr.
                                                    Pasco, WA 99301

                                                    Attorneys for Plaintiffs

PLAINTIFF'S COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 46