UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SCOTT CARLSON, TYLER PARNELL, ALISON HALLIFAX, SHARON L. DAVIS, BRIAN ROBILLARD, JOSH FREI, MATTHEW PETERSON, and ARTEM TETERIN,<br><br>            Plaintiffs,<br><br>      v.<br><br>CITY OF REDMOND,<br><br>            Defendant. | CASE NO. 2:22-cv-01739<br><br>ORDER |

## 1. INTRODUCTION

Eight former Redmond firefighters sued the City of Redmond ("City") after being terminated for refusing COVID-19 vaccinations on religious grounds. They argued the City should have let them continue working with masking and testing rather than requiring vaccination.

The Court grants the City's motion for summary judgment and dismisses all claims. Dkt. No. 86. As firefighters, Plaintiffs were required to maintain EMT or paramedic certifications and routinely provided emergency medical care to patients—including vulnerable individuals—in close quarters. Allowing them to

continue this work unvaccinated would have imposed substantial costs on the City, including health risks to coworkers and patients, potential COVID outbreaks that could cripple emergency response, and significant operational burdens. The firefighters' retaliation claims also fail because their terminations resulted from non-compliance with a neutrally applied vaccine mandate, not from requesting religious accommodations.

The Court also denies several other pending motions from both parties, including motions to strike evidence, to compel depositions, and to exclude expert testimony, and Plaintiffs' motion for summary judgment. Dkt. Nos. 110, 111, 114, 117, 123.

## 2.  BACKGROUND

### 2.1  The COVID-19 pandemic and the FDA's authorization of vaccines against COVID-19.

In early 2020, the COVID-19 pandemic emerged as a global public health crisis. On January 20, 2020, the U.S. Centers for Disease Control and Prevention (CDC) and the Washington State Department of Health (DOH) announced what was then believed to be the first confirmed case of COVID-19 in the United States in Snohomish County, Washington. Dkt. No. 89 ¶ 9. On January 30, 2020, the World Health Organization (WHO) declared the COVID-19 outbreak a "public health emergency of international concern." *Id.* ¶ 10. The next day, then-U.S. Health and Human Services Secretary Alex M. Azar II declared a public health emergency. *Id.* Over the course of 2020, public measures designed to limit the spread of COVID-19 were implemented throughout the country (e.g., "lockdown" or

"stay home" policies, masking and testing requirements, and social distancing measures). *Id.* ¶ 11. Even with these public health measures in place, hospitalization rates and death rates remained high. *Id.* ¶¶ 8, 12, 34.

Scientists began developing COVID-19 vaccines in January 2020. Dkt. No. 89 ¶ 15. By December 2020, the Food and Drug Administration (FDA) had issued emergency use authorizations for the Pfizer and BioNTech vaccine ("Pfizer vaccine") and Moderna TX, Inc. vaccine ("Moderna vaccine"). *Id.* ¶¶ 16–17. Clinical trials demonstrated that both vaccines were about 95% effective at preventing symptomatic COVID-19 infections. *Id.* ¶¶ 23–24. Researchers found that COVID-19 vaccines were the best tool to prevent transmission and to reduce the risk of post-COVID symptoms. *Id.* ¶ 32. On August 23, 2021, the FDA approved the Pfizer vaccine for individuals 16-years old and older. *Id.* ¶ 28.

By Summer 2021, the Delta variant of COVID-19 was surging in Washington State. The Delta variant was more than twice as infectious as earlier strains. *Id.* ¶ 59. In late August 2021, COVID-19 hospitalizations in Washington reached an all-time high, and unvaccinated individuals between the ages of 16 and 64 were ten times more likely to be hospitalized than vaccinated individuals. *Id.* By September 2021, 95% of hospitalized COVID-19 patients in Washington were unvaccinated. *Id.* It was in this context that Washington's vaccine mandate for healthcare workers took effect.

**2.2    The state-wide vaccine mandate and the City of Redmond's response.**

On August 9, 2021, Washington Governor Jay Inslee issued Proclamation 21-14 ("Proclamation"), requiring Washington healthcare workers—including firefighters who provide emergency medical services—to be vaccinated against COVID-19 by October 18, 2021. Dkt. No. 71-1 at 44–52. Soon after the Proclamation, Redmond Fire Department Chief Adrian Sheppard issued a "special notice" to firefighters informing them that the City would be following the state's directive and that, absent an exemption for religious or medical reasons, "vaccinations will be a condition of your employment after October 18, 2021." Dkt. No. 71-1 at 54.

In late September, the City received additional guidance from public health officials. On September 22, 2021, the Washington Department of Health issued a report recommending vaccination to reduce COVID-19 transmission. Dkt. No. 71-1 at 2–19. The next day, Dr. Thomas Rea, Medical Program Director of King County EMS, and Dr. Michael Sayre, Medical Director of the Seattle Fire Department, recommended that "EMS agencies require full vaccination against SARS-CoV-2 in order to provide direct patient care." Dkt. No. 121-1 at 2–3.

On September 30, 2021, City of Redmond Mayor Angela Birney issued an Executive Order requiring all Redmond firefighters to be vaccinated by October 18, 2021, citing the Governor's Proclamation and the public health recommendations. Dkt. No. 72-1 at 2. The Executive Order terminated previously approved accommodations that had permitted unvaccinated firefighters to work with masking and testing. *Id*. at 3.

That same day, the City and the firefighters' union—the International Association of Firefighters, Local #2829 ("Union")—signed a Letter of Understanding ("LOU") about the new vaccine mandate. Dkt. No. 72-1 at 5. The LOU offered unvaccinated employees with two options: (1) an extension for time to vaccinate or (2) voluntary separation. *Id.* at 6. The LOU did not identify any accommodation positions.

On October 20, 2021, the City and the Union signed a Letter of Agreement ("LOA") identifying five day-shift positions that could accommodate unvaccinated firefighters: Training Battalion Chief, Training Captain, Training Lieutenant, Training Firefighter, and a Telestaff position. Dkt. No. 120-1 at 24. On December 21, 2021, the City informed Plaintiffs that assignments in the LOA would be filled depending on seniority with those available to start, including vaccinated and unvaccinated staff. Dkt. No. 71-1 146–180. The LOA also informed employees that the five assignments would include a three percent reduction in pay because they would not be performing work covered by an EMT certification. Dkt. No. 72-1 at 10. On November 15, 2021, a revised LOA reduced the available positions from five to four. Dkt. Nos. 106 ¶¶ 24–25; 72-1 at 9.

### 2.3    Plaintiffs were all Redmond firefighters who provided direct patient care as part of their job duties.

Plaintiffs are Scott Carlson, Tyler Parnell, Brian Robillard, Alison Hallifax, Sharon L. Davis, Matthew Peterson, Artem Teterin, and Josh Frei. They were all Redmond firefighters in 2021 and members of the Union. Dkt. No. 71 ¶ 10. As firefighters, they were required to be credentialed as emergency medical technicians

1

2

(EMTs) or paramedics and were subject to the Proclamation as healthcare workers. Dkt. No. 72-1 at 2.

3

4

5

6

7

8

9

10

11

As firefighters, Plaintiffs' job duties included, among other things, "administer[ing] first aid to the sick and injured"; "assist[ing] in the emergency treatment or care of ill or injured patients"; using "intravenous therapy, drug therapy, respiratory therapy, manual or automatic defibrillator or other equipment or procedures to provide emergency medical care"; and "transport[ing] sick or injured patients to hospitals and other medical facilities when need arises." Dkt. No. 71-1 at 65–68. Firefighters are required to be knowledgeable of "first aid and emergency care." *Id*. at 67. They are also required to perform in working conditions that are hazardous and include "contagious disease and terminal illnesses." *Id*.

12

13

**2.4    Shortly after the special notice was issued, Plaintiffs requested exemptions from the vaccine mandate, citing their religious concerns with the COVID-19 vaccines.**

14

15

16

17

Following Chief Sheppard's August 20, 2021, special notice, each Plaintiff requested a religious accommodation from the vaccine mandate. Dkt. No. 71-1 at 71–103. City of Redmond Human Resources Director Cathryn Laird approved the requests between September 10 and September 20, 2021. *Id*.

18

19

20

21

22

Several Plaintiffs objected to the vaccines because they were developed or tested using cell lines derived from aborted fetal tissue, which conflicted with their religious beliefs opposing abortion. Dkt. Nos. 100-1 at 3; 101-1 at 2; 105-1 at 12. Others described their belief that their bodies are temples of the Holy Spirit and that receiving the vaccine would violate their duty to honor God with their bodies.

23

Dkt. Nos. 102-1; 103 ¶ 16. The City does not challenge the sincerity of Plaintiffs' religious beliefs. Dkt. No. 117 at 11.

As initially approved, Plaintiffs' exemptions allowed them to continue working with patients so long as they tested and masked. *See* Dkt. Nos. 99 ¶ 28; 100 ¶ 8; 101 ¶¶ 14–15; 102 ¶¶ 24, 26; 103 ¶ 15; 104 ¶¶ 10–11; 105 ¶ 18; 106 ¶ 10. Chief Sheppard disagreed with this approach—he believed the Proclamation prohibited unvaccinated firefighters from working in patient-facing positions, and he shared this view with City leadership. Dkt. No. 109-5 at 2, 26–27 (Sheppard Tr. at 164:13-23, 179:23-181:14); Dkt. No. 71-1 at 59–60.

As discussed above, the City received additional public health guidance in late September 2021—including the Department of Health report and the Rea-Sayre recommendation—that reinforced Chief Sheppard's view that the Governor's Proclamation prohibited unvaccinated firefighters from providing direct patient care. Dkt. No. 71-1 at 57–60. In light of this guidance, the City reconsidered its initial approach. *Id*. at 60. On September 30, 2021, Mayor Birney announced that the previously approved masking-and-testing accommodations would no longer be permitted for firefighters in patient-facing roles. Dkt. No. 72-1 at 2. The Mayor's September 30 Executive Order formally terminated all prior accommodations. *Id*. at 3. As a result, Plaintiffs faced the October 18 deadline without the accommodation they had been granted, and they would need to pursue the options set forth in the LOU or seek one of the positions identified in the LOA.

**2.5    Plaintiffs take family medical leave before the vaccination mandate takes effect.**

As the October 18, 2021, vaccine mandate deadline approached, all but one of the Plaintiffs applied for leave under the Family and Medical Leave Act (FMLA). Dkt. No. 71-1 at 105–132. Plaintiff Teterin did not take FMLA leave. He met with Chief Sheppard and HR Director Laird on October 13, 2021, for an interactive meeting. Dkt. No. 101 ¶ 19. On October 18, Teterin rejected the options presented in the LOU, and the City terminated his employment effective November 2, 2021. *Id.* ¶¶ 22, 24; Dkt. No. 71-1 at 181–185.

On October 22, 2021—two days after the LOA was signed—HR Analyst Tiah Branson emailed six Plaintiffs (Carlson, Hallifax, Robillard, Parnell, Frei, and Peterson) to notify them of the LOA positions and request that they indicate their interest by October 31, 2021. Dkt. No. 120-1 at 14–22. Davis never received this email. Dkt. No. 99 ¶ 33. Defendants include in the record an email sent from Branson to Teterin a few days after his termination informing him of the assignments. Dkt. No. 120-1 at 13. The six Plaintiffs who received the email timely expressed interest in the positions. Dkt. Nos. 100 ¶ 14; 102 ¶ 36; 103 ¶ 24; 104 ¶ 17; 105 ¶ 29; 106 ¶ 23.

On December 21, 2021, the City sent letters to Plaintiffs explaining how it intended to fill the LOA positions. The City explained it had not finalized assignments for employees on leave because it wanted to "ensure we uphold both your leave of absence rights as well as the terms and conditions listed in the [LOA]." Dkt. Nos. 100 ¶ 15; 102 ¶ 38; 103 ¶ 31; 104-1 at 27; 105 ¶ 35; 106 ¶ 27. The letters

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

stated that the City "presently intends to fill the designated current assignments by seniority with those staff who are available to work…." *Id.;* Dkt. No. 71-1 at 148–149. Plaintiffs were told: "we will discuss whether any accommodation assignments are available to you in light of your seniority as we get closer to your return date." *See, e.g.*, Dkt. No. 104-1 at 27.

Most Plaintiffs exhausted their FMLA leave in late December 2021 or early January 2022 and transitioned to Washington Paid Family and Medical Leave ("PFML"). Dkt. No. 71-1 at 134–144. Their PFML leaves were approved through late March and early April 2022. *Id*. Davis did not transition to PFML; she had elected to retire effective January 15, 2022. Dkt. No. 99-1 at 1.

### 2.6    Plaintiffs Carlson, Frei, Hallifax, Parnell, Peterson, and Robillard return to work and are terminated.

In March and April 2022, Plaintiffs Carlson, Frei, Hallifax, Parnell, Peterson, and Robillard received medical clearance to return to work. Dkt. No. 71 at 105–132. During their leave, the vaccine-exempt positions created under the LOA had been filled. *Id*. at 146–185. Although Plaintiffs expressed interest in the LOA-created positions, none of them ever applied for one of these positions. Dkt. No. 119 ¶ 15.

After Plaintiffs received medical clearance to return to work, the City held interactive meetings with each Plaintiff, except Scott Carlson, to discuss potential accommodations such as applying for non-Fire positions. Dkt. Nos. 100 ¶ 23; 102 ¶ 42; 103 ¶ 45; 104 ¶ 22; 105 ¶ 44; 106 ¶ 37. The City informed Plaintiffs during these interactive meetings that no Fire Department accommodation positions remained available and that accommodating unvaccinated firefighters would present an

undue hardship to the Fire Department. Dkt. No. 71-1 at 146–185. The City then initiated the termination process. *Id.*

In April and May 2022, Chief Sheppard issued Notices of Termination to Carlson, Frei, Hallifax, Parnell, Peterson, and Robillard. Dkt. No. 71-1 at 146–185. He considered multiple factors in deciding to terminate Plaintiffs, "including the nature of your duties, whether you work outdoors or indoors, work in a solitary or group work setting, or have close contact with other employees or members of the public (especially medically vulnerable individuals) whose vaccination status may be unknown or who may be ineligible for the vaccine." *Id.* Chief Sheppard also considered "the number of employees at the Lieutenant rank who are seeking a similar accommodation, i.e., the cumulative cost or burden on the city" and the "safety concerns, including comparing recent case data in King County, to the case data on October 18, 2021 when Proclamation 21-14 went into effect; outcomes by vaccination status for King County; and research and guidance from health departments and the Centers for Disease Control and Prevention regarding reinfections." *Id.*

**2.7    Procedural background.**

Plaintiffs filed their initial complaint in December 2022. Dkt. No. 1. As additional firefighters received right-to-sue letters from the U.S. Equal Employment Opportunity Commission, Plaintiffs twice amended their complaint to add parties. Dkt. Nos. 22; 25. The operative Second Amended Complaint was filed on August 7, 2024. Dkt. No. 58. Plaintiffs assert claims under Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e et seq., and the Washington Law Against Discrimination (WLAD), RCW 49.60 et seq., for failure to accommodate Plaintiffs' religious beliefs and retaliation. Plaintiffs also assert claims for breach of the collective bargaining agreement. *Id.*

On January 31, 2025, the City filed a Motion for Summary Judgment. Dkt. No. 69. Plaintiffs moved to defer or deny that motion under Federal Rule of Civil Procedure 56(d), arguing they had not yet had an opportunity to finish fact discovery. Dkt. No. 75. On February 19, 2025, the Court agreed and denied the City's motion without prejudice to allow the parties to complete discovery and, if appropriate, cross-move for summary judgment. Dkt. No. 76.

After the close of discovery, the City filed its renewed Motion for Summary Judgment on April 14, 2025. Dkt. No. 86. On April 29, 2025, Plaintiffs filed a Combined Motion for Partial Summary Judgment and Opposition to the City's Motion. Dkt. No. 111. Plaintiffs also moved to strike certain of the City's exhibits, Dkt. No. 110, and a Motion to Compel 30(b)(6) Depositions and Request for Sanctions, Dkt. No. 114. On May 12, 2025, Plaintiffs filed a Daubert motion to exclude the testimony of the City's expert, Dr. John Lynch. Dkt. No. 123. The City filed its Response and Reply, along with a Cross-Motion to Strike, on May 12, 2025. Dkt. No. 117. Plaintiffs filed their Reply on May 19, 2025. Dkt. No. 127. The motions are now fully briefed and ripe for decision.

1

2

## 3.  PRELIMINARY MATTERS

Before turning to the merits, the Court addresses several threshold matters raised by the parties: cross-motions to strike evidence, Plaintiffs' motion to compel Rule 30(b)(6) testimony, and Plaintiffs' *Daubert* motion to exclude the testimony of Defendant's expert, Dr. John Lynch.

### 3.1    The Court denies the parties' cross-motions to strike.

The Court first addresses the parties' cross-motions to strike. To begin, Plaintiffs' separately filed Motion to Strike, Dkt. No. 110, violates Local Civil Rule 7(g), which provides that requests to strike material "shall not be presented in a separate motion to strike, but shall instead be included in the responsive brief." Plaintiffs offer no justification for disregarding this rule. Plaintiffs' Motion to Strike is thus denied as procedurally improper. *See Robinson v. Univ. of Wash.,* No. C15-1071RAJ, 2016 WL 4218399, at *1 n.2 (W.D. Wash. Aug. 9, 2016) (failure to follow LCR 7(g) is an independent ground to deny a motion to strike), *aff'd*, 691 F. App'x 882 (9th Cir. 2017). The Court nonetheless considers the substance of Plaintiffs' objections as presented in their combined briefing.

Neither side's objections have merit. At the summary judgment stage, the Court does not focus on the admissibility of evidence in its present form, but rather on whether the evidence could be presented in an admissible form at trial. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see* Fed. R. Civ. P. 56(c)(2).

Plaintiffs challenge Christie Declaration Exhibits 1 and 2—a Johns Hopkins article and a Presidential proclamation on COVID-19 deaths—as irrelevant because

Plaintiffs "do not dispute" the pandemic's severity. Dkt. No. 110 at 2. This misunderstands relevance. That a fact is undisputed does not render evidence of it inadmissible; these documents provide context for the City's decision-making and are subject to judicial notice. Fed. R. Evid. 201.

Plaintiffs also object to the Rea-Sayre letter because Chief Sheppard "solicited" it. Dkt. No. 110 at 3. But the letter is not offered to prove the truth of its medical recommendations; it is offered to show what guidance the City received—a non-hearsay purpose. Fed. R. Evid. 801(c)(2).

Plaintiffs' objection to the "whereas" clauses in Governor Inslee's Proclamation borders on frivolous. Plaintiffs ask the Court to redact a governor's emergency proclamation to excise its prefatory recitals as "hearsay." Dkt. No. 110 at 3. The recitals provide the legal and factual basis for the government action at issue here and fall squarely within the public records exception. Fed. R. Evid. 803(8).

Plaintiffs' remaining objections fare no better. Their challenge to Chief Sheppard's declaration from a related case, Dkt. No. 110 at 3, identifies no specific inadmissible statement. Their objection to the Civil Service Commission proceedings, Dkt. No. 110 at 4, is moot given their abandonment of the breach of contract claim. Dkt. No. 127 at 4.

Turning to Defendant's objections, the City moves to strike Plaintiffs' expert Dr. Michael Mina's declaration in its entirety, arguing it impermissibly expands on his timely disclosed expert report and is really a belated rebuttal to Defense expert Dr. Lynch's report. Dkt. No. 117 at 5–8. Because Dr. Mina's timely disclosed expert report is not in the summary judgment record, the Court cannot determine the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

extent to which Dr. Mina's declaration differs from his timely disclosed expert report, if at all. The Court is troubled by the allegation that Plaintiffs introduced untimely expert opinions, but this issue is better resolved at trial, where appropriate limits can be enforced. For purposes of this motion, the Court declines to strike the declaration.

Finally, the City objects to two other declarations—those of Ben Norton and Kelsey Allen-Wesley—as containing improper expert opinion testimony and speculation about the efficacy of accommodations. Dkt. Nos. 98; 107. The Court does not rely on these declarations as expert testimony and has disregarded any inadmissible hearsay or speculation in reaching its conclusions.

Both parties' motions to strike are DENIED. Dkt. Nos. 110; 117.

## 3.2    Plaintiffs' motion to compel Rule 30(b)(6) testimony is denied.

Plaintiffs also move to compel additional Rule 30(b)(6) testimony, to dismiss or preclude the City's undue hardship defense, and for monetary sanctions. Dkt. No. 114.

First, Plaintiffs contend the City waived its undue hardship defense by failing to plead it and through discovery abuse. The Court disagrees. The City asserted undue hardship in its first summary judgment motion filed January 31, 2025. Dkt. No. 69 at 13. When Plaintiffs raised concerns about conducting discovery on this defense, the Court extended the discovery deadline. Dkt. No. 78. Plaintiffs cannot credibly claim lack of notice or opportunity. The waiver argument fails.

1    Next, the Court considers whether the City satisfied its Rule 30(b)(6)

2   obligations. A party must prepare its Rule 30(b)(6) designee to testify competently

3   on the noticed topics with "all the relevant information known or reasonably

4   available to the entity[.]" *Corker v. Costco Wholesale Corp.*, No. C19-0290-RSL, 2022

5   WL 92979, at *2 (W.D. Wash. Jan. 10, 2022) (citing *La. Pac. Corp. v. Money Mkt. 1*

6   *Institutional Inv. Dealer*, 285 F.R.D. 481, 487 (N.D. Cal. 2012)). If a designee cannot

7   answer fully, the organization must promptly designate a new witness. *O.H. v.*

8   *Secret Harbor*, No. 2:23-CV-00060-JNW, 2024 WL 4605241, at *2–3 (W.D. Wash.

9   Oct. 29, 2024).

10    The record reflects a troubling pattern. The City withdrew Chief Sheppard's

11   designation three days before his scheduled 30(b)(6) deposition—after obtaining a

12   month-long extension to prepare him—and substituted Jim Whitney, who then

13   testified he could not speak to Topics 13, 19, 20, or 21. Dkt. No. 115 ¶¶ 16, 18; Dkt.

14   No. 129-2 at 5–6 (Whitney Tr. at 19:14–20:22). HR Director Laird similarly

15   disclaimed competence on multiple topics despite extensive preparation sessions

16   with counsel. Dkt. No. 115 ¶ 9. Also troubling is the City's current offer to be bound

17   by Chief Sheppard's testimony. Courts recognize an organization may satisfy Rule

18   30(b)(6) by adopting prior testimony. *Corker*, 2022 WL 92979, at *2. But defense

19   counsel told Plaintiffs before Sheppard's deposition that he was unprepared on the

20   30(b)(6) topics, leading Plaintiffs to limit their questioning. Dkt. No. 115 ¶ 6; Dkt.

21   No. 129 at 4–5. A party cannot discourage questions by saying a witness is not

22   ready, only to then turn around and call the resulting testimony comprehensive.

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Nevertheless, viewing the record as a whole, the Court finds substantial compliance. The City produced four witnesses—Laird, Whitney, Sheppard, and Mayor Birney—who collectively testified on the noticed topics, including the City's reasons for the vaccine mandate, the rescission of provisional accommodations, and the accommodation assignment process. Dkt. No. 125 at 3–10. The City agrees to be bound by Birney's and Sheppard's testimony as organizational admissions. Dkt. No. 125 at 14. Given this adoption, the prior discovery extension, and the totality of testimony obtained, Plaintiffs have not shown sufficient prejudice to warrant additional depositions.

The Court is particularly troubled by the City's conduct related to Topic 19, which concerns the factual basis for its undue hardship defense. The City claimed that this topic sought information "neither relevant nor proportionate," Dkt. No. 126-1 at 96, while at the same time moving for summary judgment on that very defense. This is difficult to reconcile. But dismissal of an affirmative defense is a severe sanction reserved for bad faith or willfulness, *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007), which the Court does not find here.

Finally, the Court addresses Plaintiffs' request for $7,325 in fees. Under Rule 37(a)(5), when a motion to compel is denied, the Court may award expenses to the opposing party unless the motion was substantially justified. Plaintiffs' motion was substantially justified given the City's conduct: witnesses who disclaimed competence on the record, last-minute substitutions, and inconsistent positions on relevant topics. A reasonable litigant would have questioned whether the City

1  fulfilled its obligations. At the same time, the City substantially complied when the

2  record is viewed in full, and its offer to be bound by witness testimony was a

3  reasonable remedial measure. Thus, each party will bear its own costs.

4      Accordingly, Plaintiffs' Motion to Compel is DENIED. Dkt. No. 114. This

5  ruling is conditioned on the City's representation that it will be bound by the

6  testimony of Mayor Birney and Chief Sheppard as Rule 30(b)(6) organizational

7  testimony.

8  **3.3    The Court denies Plaintiffs' motion to exclude Dr. Lynch.**

9      The Court previously terminated Plaintiffs' motion to exclude Dr. John Lynch

10  pending resolution of the summary judgment motions, Dkt. No. 148, but now finds

11  it necessary to rule on the motion to fully address the issues on summary judgment.

12      Plaintiffs challenge Dr. Lynch's qualifications, arguing he lacks expertise in

13  masking and testing, that his opinions are irrelevant because Defendant allegedly

14  lacks an undue hardship defense, and that his method is unreliable because he does

15  not conduct original research. Dkt. No. 123 at 2, 5–6, 8. These arguments are

16  unavailing.

17      Dr. Lynch is a board-certified physician in infectious disease, Professor of

18  Medicine at the University of Washington, and Associate Medical Director of

19  Harborview Medical Center. Dkt. No. 89 ¶ 2. He led UW Medicine's COVID-19

20  Emergency Operations Center from February 2020 through December 2023,

21  overseeing PPE and testing policies, and has authored 82 peer-reviewed

22  publications, including 15 on COVID-19. *Id.* ¶ 3; Dkt. No. 89-1 at 10. Courts in this

23

1    District—and the Ninth Circuit—have repeatedly found Dr. Lynch qualified to offer

2    expert testimony on infectious diseases and COVID-19 mitigation strategies. *See*

3    *Petersen v. Snohomish Reg'l Fire & Rescue*, No. C22-1674, 2024 WL 278973, at *6

4    n.13 (W.D. Wash. Jan. 25, 2024), aff'd, 150 F.4th 1211 (9th Cir. Sept. 2, 2025); *Rosa*

5    *v. City of Issaquah*, No. 2:24-CV-01673-TL, 2025 WL 2645642, at *4–8 (W.D. Wash.

6    Sept. 15, 2025). This Court, too, has relied on Dr. Lynch's expert testimony in

7    similar COVID-19 vaccine mandate cases. *See Eshom v. King County,* No. 2:23-CV-

8    00028-JNW, 2025 WL 3187479, at *8 (W.D. Wash. Nov. 14, 2025).

9        Plaintiffs' reliability challenge fares no better. Medical experts commonly

10    base their opinions on clinical experience, peer-reviewed literature, and public

11    health guidance—precisely the materials Dr. Lynch relies on here. *See Primiano v.*

12    *Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (the reliability inquiry for physician

13    testimony must be "flexible" and need not require original research). The Ninth

14    Circuit has explained that expert testimony is reliable if the knowledge underlying

15    it has a reliable basis in the knowledge and experience of the relevant discipline.

16    *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654–55 (9th Cir. 2006). Dr.

17    Lynch's opinions are grounded in decades of clinical experience, extensive review of

18    scientific literature, and his direct involvement in the public health response to

19    COVID-19. If Plaintiffs wish to challenge what Dr. Lynch failed to consider or

20    address, such critiques go to weight and credibility—subjects for cross-

21    examination—not admissibility.

22        Accordingly, Plaintiffs' motion to exclude Dr. Lynch is DENIED. Dkt. No.

23    123.

1

## 4.  DISCUSSION

### 4.1    Legal standard.

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986).

Determining the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 252. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S.

871, 888–89 (1990). Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Id.*

### 4.2    Failure to accommodate under Title VII and the WLAD.

Turning to the substantive claims, the City moves for summary judgment on Plaintiffs' failure to accommodate claims. Dkt. No. 86. Plaintiffs move for partial summary judgment on their prima facie cases of failure to accommodate. Dkt. No. 111.

Under Title VII, it is unlawful for an employer to discriminate against an individual because of the individual's religion. 42 U.S.C. § 2000e-2(a)(1). The term "religion" includes all aspects of religious observance and practice, and an employer must reasonably accommodate an employee's religious observance or practice unless doing so would impose an undue hardship on the conduct of the employer's business. 42 U.S.C. § 2000e(j). Washington law imposes parallel requirements. RCW 49.60.030(1); *Suarez v. Wash.*, 552 P.3d 786, 799 (Wash. 2024).

To state a failure to accommodate claim, "a plaintiff must first set forth a prima facie case that (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Petersen v. Snohomish Reg'l Fire & Rescue*, 150 F.4th 1211, 1216 (9th Cir. 2025). Once a plaintiff establishes a prima facie case, the burden shifts to the employer to show either that it initiated good-faith efforts to reasonably

accommodate the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship. *Id.*; *see Suarez*, 552 P.3d at 799–800 (religious failure to accommodate claims under the WLAD are analyzed under the federal framework).

The City does not contest the sincerity of Plaintiffs' religious beliefs. Dkt. No. 117 at 11. Plaintiffs' written exemption requests cited religious objections to COVID-19 vaccines—some based on the vaccines' connection to fetal cell lines derived from abortion, others based on the belief that their bodies are temples of the Holy Spirit. The Court assumes Plaintiffs have established their prima facie case. The questions remaining are whether the City engaged in good-faith efforts to accommodate Plaintiffs and whether further accommodation would impose an undue hardship.

### 4.2.1    Accommodating Plaintiffs in their patient-care roles would have imposed undue hardship.

Accommodating Plaintiffs in their patient-care roles would have imposed undue hardship on the City. An employer need not accommodate an employee's religious practice if doing so would impose "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). To establish undue hardship, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023); *see Suarez*, 552 P.3d at 798–99 (adopting *Groff* formulation of undue hardship defense in response to religious failure to accommodate cases). Courts must take a context-specific approach,

considering all relevant factors including the particular accommodations at issue and their practical impact considering the nature, size, and operating cost of the employer. *Groff*, 600 U.S. at 470–71; *see also Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999) ("What constitutes undue hardship must be determined within the particular factual context of each case.").

Thus, "analysis of an 'undue hardship' defense is not simply a financial or monetary loss calculation." *Suarez*, 552 P.3d at 799. Courts may consider the accommodation's effect on coworkers, risks to an employer's mission, and health and safety concerns. *Petersen*, 150 F.4th at 1218–22; *see also Groff*, 600 U.S. at 472 ("Costs" encompass an "accommodation's effect on co-workers" which "may have ramifications for the conduct of the employer's business."); *Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1151 (D. Or. 2024) ("Consistent with the pre- and post-*Groff* authority...it is appropriate to consider not only calculable economic costs but also non-economic costs, like the cost to an employer's mission and potential safety risks, in analyzing undue hardship."); *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1134 (C.D. Cal. 2023), *aff'd*, No. 23-4340, 2025 WL 655065 (9th Cir. Feb. 28, 2025) ("Non-economic impacts on coworkers can be considered, so long as those impacts are not the result of employee animosity to a particular religion, to religion in general, or the notion of accommodating religious practice.") (citing *Groff*, 600 U.S. at 472). "Numerous courts [assessing COVID-19 vaccination requirements] have found the possibility of an unvaccinated individual getting others sick to be a non-speculative risk that a court may consider when performing an undue hardship analysis." *Bordeaux*, 703 F. Supp. 3d at 1136 (collecting cases).

1    This case is just like *Petersen v. Snohomish Reg'l Fire & Rescue*. In *Petersen*,

2    the Ninth Circuit affirmed summary judgment for a fire department that

3    terminated unvaccinated firefighters who sought religious accommodations from a

4    COVID-19 vaccine mandate. The court identified three categories of substantial

5    costs supporting undue hardship: (1) health and safety costs to employees and the

6    public; (2) operational burdens from potential COVID outbreaks among essential

7    personnel; and (3) financial costs including increased absenteeism and scheduling

8    disruptions. *Petersen*, 150 F.4th at 1218–22. Each category applies here.

9    Plaintiffs were required to maintain EMT or paramedic certifications and

10   were expected to provide direct patient care. Dkt. No. 72-1 at 2. Their job duties

11   included administering first aid, providing emergency medical treatment, and

12   transporting patients in vehicles. Dkt. No. 71-1 at 65–68. The City's expert, Dr.

13   John Lynch—a board-certified infectious disease physician and Professor of

14   Medicine at the University of Washington—testified that vaccination combined with

15   masking and testing provided superior protection compared to masking and testing

16   alone. Dkt. No. 89 ¶¶ 53–54. He explained that vaccines and masks are

17   "complements[,] not a substitute"—masks provide external protection during work

18   hours, while vaccines provide internal immunity around the clock. *Id*. ¶ 53. He

19   added that firefighters face elevated transmission risks because they work in

20   confined spaces, share living quarters, and interact with vulnerable patients in

21   uncontrolled environments. *Id*. ¶¶ 89–93.

22   Dr. Lynch's testimony tracks the expert evidence credited by the Ninth

23   Circuit in *Petersen*. There, Dr. Lynch provided similar testimony explaining why

masking and testing were inadequate alternatives to vaccination for patient-facing emergency medical personnel. *Petersen,* 150 F.4th at 1219–20. The court found that allowing unvaccinated firefighters to continue working would have come at a substantial cost because the medical evidence showed significant health and safety risks to both the workforce and the public. *Id.* at 1220.

The City also faced the prospect of COVID outbreaks that could sideline multiple firefighters at the same time, hampering emergency response capabilities. As Dr. Lynch explained, outbreaks among firefighting teams would lead to potentially severe limits on EMS and firefighting responses in the community. Dkt. No. 89 ¶ 100. This concern is not speculative. In *Petersen,* the Ninth Circuit recognized that fire departments provide essential services during emergencies, and the cost of widespread absences among firefighters not only imposes real and substantial costs on the employer but also threatens real costs on the community. 150 F.4th at 1220–21.

Chief Sheppard's termination letters reflected individualized consideration of these factors. Dkt. No. 71-1 at 146–185. He considered the nature of each Plaintiff's duties, including whether they worked indoors or outdoors, in solitary or group settings, and whether they had close contact with medically vulnerable individuals. *Id.* He also considered the cumulative cost of accommodating multiple firefighters seeking similar accommodations. *Id.* This is precisely the kind of context-specific analysis *Groff* requires.

Finally, the City faced financial and personnel costs from backfilling patient-care positions vacated by unvaccinated firefighters. Chief Sheppard considered

these costs in his termination decisions. Dkt. No. 71-1 at 146–185. The City's Training Division was operating at what Medical Services Administrator Jim Whitney described as a "blistering pace." Dkt. No. 118-1 at 27 (Whitney Tr. 76:7–77:1). Leaving accommodation positions unfilled for months while Plaintiffs remained on indefinite medical leave would have imposed substantial operational costs.

Accordingly, the City has demonstrated that Plaintiffs' request to continue to work unvaccinated would have posed an undue hardship. *See Groff*, 600 U.S. at 469; *Petersen*, 150 F.4th at 1222.

### 4.2.2    Plaintiffs fail to raise genuine disputes of material fact.

Plaintiffs do not meaningfully challenge the City's evidence of undue hardship. Instead, they attack the efficacy of COVID-19 vaccines and argue that masking and testing would have been reasonable alternatives. Dkt. No. 111. These arguments fail to create a triable issue.

First, Plaintiffs contend that testing and masking were reasonable substitutions for the vaccine mandate. But Dr. Lynch's unrebutted testimony establishes that these measures are complements, not substitutes, for vaccination. Dkt. No. 89 ¶¶ 53, 69–70. The Ninth Circuit accepted this same reasoning in *Petersen*, holding that the employer's determination that masking and testing were inadequate alternatives to vaccination was reasonable. 150 F.4th at 1219–20.

Plaintiffs rely heavily on the declarations of Ben Norton and Kelsey Allen-Wesley, who opine that unvaccinated firefighters could have safely performed their

duties with existing safety protocols. Dkt. Nos. 98 ¶ 38; 107 ¶¶ 31–32. This anecdotal and conclusory evidence does not rebut Dr. Lynch's testimony, which is grounded in peer-reviewed research and clinical experience. *See Petersen*, 150 F.4th at 1219–20 (crediting Dr. Lynch's expert testimony over plaintiffs' lay assertions that they were "able to safely perform their job" and "never transmitted COVID to another employee, co-worker, or patient, or member of the public"). Plaintiffs' expert, Dr. Michael Mina, opines that non-pharmaceutical interventions could provide superior protection, Dkt. No. 108 ¶ 124, but even accepting this testimony, it does not rebut Dr. Lynch's central point—vaccination combined with other mitigations is superior to those mitigations alone. Dkt. No. 89 ¶ 54.

Moreover, the undue hardship analysis evaluates the employer's decision when made, not with hindsight. *Petersen*, 150 F.4th at 1222; *Efimoff v. Port of Seattle*, No. C23-1307, 2024 WL 4765161, at *9 (W.D. Wash. Nov. 13, 2024) (collecting cases). In October 2021, the City followed guidance from the Washington Department of Health and King County EMS, both of which recommended vaccination for patient-facing healthcare workers. Dkt. Nos. 71-1 at 44; 121-1 at 2. Much of Dr. Mina's testimony draws on studies published in late 2021 and 2022— after the City made its accommodation decisions. *See, e.g.*, Dkt. No. 108 ¶¶ 32–33, 107. Whatever those later studies may show about vaccine transmission efficacy, they do not establish that the City acted unreasonably in relying on the public health consensus as it existed at the time. The City was entitled to follow contemporaneous guidance from authoritative sources; it was not required to anticipate how scientific understanding might evolve.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Second, Plaintiffs argue that the City never placed them in the LOA-created accommodation positions. Dkt. No. 111 at 11–15, 30–33. But Plaintiffs do not dispute that they were on FMLA or PFML leave when those positions were filled, with medical certifications stating they could not work. An employee cannot simultaneously claim to be medically unable to work and demand placement in a position requiring work. The City reasonably filled the limited accommodation positions with employees who were available. *See* Dkt. No. 104-1 at 27 (City explaining it would fill positions by seniority among employees available to work). In any event, the LOA identified only four positions, but eight unvaccinated firefighters sought accommodation. Thus, not every firefighter could have been placed. Title VII does not require employers to create unlimited accommodation positions or hold positions open indefinitely for employees on extended medical leave. Additionally, Plaintiffs did not apply for the LOA-created assignments after they were announced. Dkt. No. 119 ¶ 15. Plaintiffs cannot defeat summary judgment on a failure to accommodate claim by pointing to accommodation positions they did not apply to.

Third, Plaintiffs point to neighboring fire departments, hospitals, and police departments that permitted unvaccinated employees to continue working. Dkt. No. 111 at 17–20, 21–24. This evidence does not create a genuine dispute. The undue hardship analysis is employer-specific, focusing on the particular accommodations at issue and their practical impact in light of this employer's nature, size, and operating costs. *Groff*, 600 U.S. at 470–71. That other employers made different choices does not establish that the City's determination was unreasonable,

particularly when the City was following guidance from the Governor's Proclamation and recommendations from King County public health officials.

Lastly, Plaintiffs argue that by April and May 2022, when terminations occurred, COVID protocols had relaxed sufficiently that they should have been permitted to work with masking and testing. Dkt. No. 127 at 8, 22. But Governor Inslee's Proclamation 21-14 remained in effect through the termination dates, with the most recent amendment issued on March 23, 2022. Dkt. No. 88-1 at 10. The termination letters reflect that Chief Sheppard compared contemporaneous case data from March 2022 to baseline data from October 2021, considered outcomes by vaccination status, and reviewed current CDC and health department guidance. *See, e.g.*, Dkt. No. 100-1 at 9. That the City relaxed protocols for non-healthcare employees and the public does not establish that it could safely do so for patient-facing firefighters covered by the Proclamation. *Petersen* forecloses this species of hindsight-based argument: courts cannot judge employers "with the clarity of hindsight or the benefit of post-pandemic debates over what measured responses frontline employers should have taken." 150 F.4th at 1222.

In sum, the City has demonstrated that it engaged in good-faith efforts to accommodate Plaintiffs, and that further accommodation would impose undue hardship. Plaintiffs have failed to raise genuine disputes of material fact on either ground.

1

### 4.2.3    Individual plaintiff circumstances do not alter the analysis.

Although the analysis above resolves Plaintiffs' claims, three present distinct factual circumstances warrant individual attention: Teterin, Davis, and Robillard.

Unlike the other Plaintiffs, Teterin did not take FMLA leave. He participated in an interactive meeting with Chief Sheppard and HR Director Laird on October 13, 2021. Dkt. No. 118-1 at 9–11. During that meeting, Teterin proposed using a "SCVA [sic] mask" with a backpack air tank as an accommodation, which the City rejected. Dkt. No. 101 ¶ 19. On October 18, 2021, Teterin rejected all options presented in the LOU and informed the City he would not select either vaccination or voluntary separation. Dkt. No. 71-1 at 181–185. The City warned him this would result in termination, which Teterin acknowledged. *Id.* He was terminated effective November 2, 2021. *Id.*

Teterin argues the City never offered him any of the LOA positions. Dkt. No. 101 ¶¶ 27–28. But the LOA was not signed until October 20, 2021—two days after Teterin rejected the available options and made clear he would not participate further. By that point, Teterin had disengaged from the interactive process. He declined an opportunity to attend a *Loudermill* hearing, asking whether anything could change the outcome and, upon learning it could not, choosing not to participate. *Id.* ¶ 25. An employer cannot be faulted for failing to offer further accommodations to an employee who has rejected the options presented and withdrawn from the process. And even if a breakdown in the interactive process were owing to the City, "there exists no stand-alone claim for failing to engage in the interactive process," *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th

1   Cir. 2018), and "[i]f an employer can show that no accommodation was possible

2   without undue hardship, it makes no sense to require that [it] engage in a futile

3   act," *E.E.O.C. v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 (9th Cir. 1988).

4        Davis's circumstances are distinct because she voluntarily retired. Her FMLA

5   leave—unlike the other Plaintiffs—was to care for a family member recovering from

6   surgery, not because of stress from the vaccine mandate. Dkt. No. 71-1 at 110–112.

7   On October 14, 2021, Davis submitted a resignation letter effective January 15,

8   2022. Dkt. No. 99-1 at 1. When her FMLA leave ended, the City confirmed her

9   voluntary separation. *Id.*

10       Davis argues she "retired under duress" because she faced the choice of

11  vaccination or termination. Dkt. No. 99 ¶¶ 31–32. But the undisputed record shows

12  the City accepted Davis's voluntary resignation—it did not terminate her. A

13  resignation, even one made under difficult circumstances, is not an adverse

14  employment action where the employee chooses to leave rather than pursue other

15  options. Importantly, Davis has not alleged constructive discharge, but even if she

16  had, she has not shown that her situation at work was so unbearable that a

17  reasonable person in her position would have felt compelled to resign. *See Green v.*

18  *Brennan,* 578 U.S. 547, 555 (2016) (to establish a claim of constructive discharge,

19  "[a] plaintiff must prove first that he was discriminated against by his employer to

20  the point where a reasonable person in his position would have felt compelled to

21  resign.").

22       Robillard presents the most complex fact pattern. At the time of the vaccine

23  mandate, he was serving as Training Lieutenant—an administrative, non-patient-

facing position. Dkt. No. 105 ¶¶ 2–4. When the City later executed the LOA identifying accommodation positions, it included Training Lieutenant—that is, the position Robillard already held. Dkt. No. 127 at 15–17. Plaintiffs argue this should have ended the matter: Robillard was already in an accommodation-eligible role and should have been permitted to remain there. *Id*.

The complicating factor, however, is Robillard's medical leave. On October 8, 2021, Robillard filed for FMLA leave, supported by a healthcare provider certification stating he required continuous leave because of a serious health condition. Dkt. No. 71-1 at 130–132. That leave extended through PFML into early 2022. *Id*. at 144. Once Robillard's physician certified that he required continuous leave, the City was obligated to treat him as unavailable for work—whatever the underlying cause.

By March 2022, when Robillard returned, the Training Lieutenant position had been posted for open enrollment (February 18 through March 21), and another firefighter—who was vaccinated—had applied and been selected. Dkt. No. 119-1 at 27. The LOA required accommodation positions to be filled by seniority among employees "available to work." Dkt. No. 120-1 at 32. When the position was posted, Robillard remained on leave and was unavailable. Robillard was cleared by his medical provider to return to work on March 27, 2022. Dkt. No. 105 ¶ 39. Although he expressed interest in the position, he did not submit a formal application before the deadline. The other firefighter did, and under the LOA and CBA, was properly selected.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Plaintiffs' implicit argument is that the City should have held Robillard's position open while he was on leave. While that is perhaps an FMLA interference or discrimination claim, Robillard has alleged a Title VII religious accommodation claim, not a FMLA interference or discrimination claim. Plaintiffs cite no case holding that Title VII requires employers to hold positions open indefinitely for employees on extended medical leave. Nor have they cited authority requiring employers to override collectively bargained seniority and assignment procedures to benefit a single employee. To the contrary, requiring the City to bypass the other firefighter's rights under the LOA and CBA would itself constitute an undue hardship. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 79–81 (1977) (deprivation of other employees' bargained-for seniority rights constitutes undue hardship).

In sum, the individual circumstances of Teterin, Davis, and Robillard do not alter the Court's conclusion—none have shown the City could have provided a reasonable accommodation without undue hardship.

## 4.3    Plaintiffs' retaliation claim also fails.

To establish a Title VII retaliation claim, a plaintiff must show that retaliation "was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). Even assuming that requesting a religious accommodation constitutes protected activity under Title VII, Plaintiffs cannot satisfy this standard.

Plaintiffs argue that the City retaliated against them by singling out a "small group of unvaccinated firefighters." Dkt. No. 111 at 31. But this conflicts with the record, which shows that the vaccine mandate applied to all Redmond firefighters. Firefighters who complied—whether by vaccinating or by obtaining placement in an accommodation position—retained their employment. Those who did not comply were separated. The Ninth Circuit recently rejected the same theory in *Leake v. Raytheon Technologies Corp.*, holding that "the but-for cause of Plaintiffs' termination was not their religious objections to the vaccine, but rather Plaintiffs' refusal to comply with the conditions that [the employer] neutrally imposed on all non-vaccinated employees." *Leake v. Raytheon Techs. Corp.*, No. 23-15320, 2024 WL 1854287, at *2 (9th Cir. Apr. 29, 2024) (internal quotation marks omitted), *cert. denied*, 145 S. Ct. 428, 220 L. Ed. 2d 177 (2024); *see also Ashcroft v. S. Cal. Permanente Med. Grp.*, 763 F. Supp. 3d 1130, 1141–42 (C.D. Cal. 2024) (similar).

Plaintiffs raise several other arguments; none are persuasive. Plaintiffs contend the LOA's three-percent pay reduction for accommodation positions is evidence of retaliation. Dkt. No. 111 at 33. But the LOA explains that the reduction applies "[b]ecause the Employee will not perform the work covered by the EMT certification[.]" Dkt. No. 120-1 at 24. This is a facially neutral adjustment tied to job duties. The pay adjustment was also collectively bargained with the Union, further undermining any inference of retaliatory intent.

Plaintiffs also point to the City's implementation of the accommodation process: the timing of position postings, an internal "Action Plan" to fill positions, statements by Chief Sheppard about availability, and the selection of vaccinated

firefighters for certain roles. Dkt. No. 111 at 8, 33. But imperfections in an accommodation process do not establish that retaliation was the but-for cause of termination. The LOA provided that current assignments would be filled using CBA procedures among employees "available to work." Dkt. No. 100-1 at 31. Plaintiffs were on extended medical leave when positions were posted and filled. The City adhered to collectively bargained procedures. Even if communications could have been clearer, Plaintiffs were terminated for non-compliance with the mandate—not for requesting accommodations.

Plaintiffs' remaining arguments fare no better. The fact that unvaccinated police officers were not subject to the mandate, Dkt. No. 111 at 21–24, reflects the scope of the Governor's Proclamation—not animus toward firefighters who sought exemptions. And the City's failure to offer Fire Prevention positions, Dkt. No. 127 at 17–20, bears on accommodation, not retaliation.

Because Plaintiffs have not raised a genuine dispute that their terminations were caused by anything other than non-compliance with the vaccine mandate, their retaliation claim fails.

### 4.4    Plaintiffs abandon their breach of contract claim.

Plaintiffs' complaint included a claim for breach of the Collective Bargaining Agreement. Dkt. No. 58 at 13. In their subsequent briefing, however, Plaintiffs expressly withdrew this claim, stating they "are withdrawing their breach of contract claim by virtue of their non-opposition to dismissal herein." Dkt. No. 110 at 4. The City is thus entitled to summary judgment on this claim. *See Shakur v.*

*Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) (plaintiff "abandoned claims by not raising them in opposition to the defendant's motion for summary judgment." (citation modified)).

## 5. CONCLUSION

In sum, the Court ORDERS

(1) Defendant City of Redmond's motion for summary judgment, Dkt. No. 86, is GRANTED. Plaintiffs' claims are DISMISSED with prejudice.

(2) Plaintiffs' motion for partial summary judgment, Dkt. No. 111, is DENIED.

(3) Plaintiffs' motion to strike Defendant's exhibits, Dkt. No. 110, is DENIED.

(4) Plaintiffs' motion to compel FRCP 30(b)(6) testimony and request for sanctions, Dkt. No. 114, is DENIED.

(5) Defendant's Cross Motion to Strike and Response to Plaintiffs' Motion for Summary Judgment, Dkt. No. 117, is DENIED.

(6) Plaintiffs' Motion to Exclude Defendant's Expert Dr. Lynch, Dkt. No. 123, is DENIED.

Dated this 5th day of December, 2025.

Jamal N. Whitehead
United States District Judge